# IN THE SUPREME COURT OF TENNESSEE
## AT NASHVILLE
October 6, 2005 Session

### STATE OF TENNESSEE v. JAMES D. NICHOLSON

**Appeal by permission from the Court of Criminal Appeals**
**Criminal Court for Davidson County**
**No. 2003-C-2381     J. Randall Wyatt, Jr., Judge**

**No. M2004-00111-SC-R11-CD - Filed on April 17, 2006**

We granted review to address the following certified question that was reserved by Defendant, James D. Nicholson, following his guilty plea to possession of cocaine for resale: "whether the evidence seized from the defendant in this case should have been suppressed because it was seized pursuant to the warrantless arrest of the defendant for which the police had no probable cause in violation of the 4th Amendment to the United States Constitution and Article One, Section Seven of the Tennessee Constitution as well as the Tennessee Supreme Court's decision in State of Tennessee v. Perry Thomas Randolph, 74 S.W.3d 330 (Tenn. 2002)." After being instructed to "hold up" by a detective, Defendant turned and ran. A majority of the Court of Criminal Appeals concluded that Defendant was seized when he was thereafter pursued and apprehended by officers. The intermediate court concluded that, because the detectives lacked reasonable suspicion or probable cause to effectuate such a seizure, the evidence flowing therefrom must be suppressed. After careful review of the record and applicable authority, we concur with the judgment rendered by the Court of Criminal Appeals. Accordingly, we affirm the judgment of the Court of Criminal Appeals, reverse and vacate Defendant's conviction and dismiss the charges. We also emphasize the importance of creating an adequate record for review in cases such as this one.

### Tenn. R. App. 11 Appeal by Permission
### Judgment of the Court of Criminal Appeals Affirmed

CORNELIA A. CLARK, J., delivered the opinion of the court, in which WILLIAM M. BARKER, C.J., and E. RILEY ANDERSON AND ADOLPHO A. BIRCH, JR., JJ., joined. JANICE M. HOLDER, J., filed a dissenting opinion.

Paul G. Summers, Attorney General and Reporter; Michael E. Moore, Solicitor General; Elizabeth B. Marney, Senior Counsel; Victor S. Johnson, III, District Attorney General; and Michael Rohling, Assistant District Attorney General, for the appellant, State of Tennessee.

James O. Martin, III, Nashville, Tennessee, for the appellee, James D. Nicholson.

# OPINION

## BACKGROUND

Defendant, James D. Nicholson, was indicted for evading arrest, resisting arrest, criminal trespassing, and possessing with intent to sell or deliver .5 grams or more of a substance containing cocaine. Defendant filed a motion to suppress the evidence seized from him at the time of his arrest.

The only evidence presented at the suppression hearing and contained in this record is the testimony of Detective Ryan Lockwood of the Metropolitan Nashville Police Department. Because of the importance of the actual record to the analysis in this case, we quote the relevant portion of Detective Lockwood's testimony in its entirety:

Q. And were you working at about 11:30, at night, on that date?

A. Yes, I was.

Q. On that day, did you have an occasion to come in contact with Mr. James Nicholson?

A. Yes, I did.

Q. Will you tell the Judge how that occurred?

A. On the seventh of July, we were conducting gang investigations in the John Henry Hale Housing Projects.

Q. And when you say "we," who do you mean?

A. Myself, other intelligence division detectives and West Flex.

THE COURT: Were you in the Intelligence Section or the Flex Unit?

THE WITNESS: Intelligence.

THE COURT: You -- so you're in Intelligence?

THE WITNESS: Yes, sir.

THE COURT: Okay. Fine.

A. (By the Witness) We observed a large crowd of individuals around the Henry Place area where it comes down to Charlotte. At that time, we witnessed various hand-to-hand transactions amongst the group, different people coming and going. At that time, the decision was made to speak with several of the individuals, in an attempt to gather gang intelligence. When we, first, initially, approached, several individuals struck out running. I, initially --

Q. All this -- when you say "around Henry Hale," is this on MDHA property?

A. Yes, it is.

Q. Okay. And I assume there's no trespassing signs?

A. That's correct. On about every building.

Q. Okay.

A. At that time, I begin to give chase to one subject on foot from a distance. By the time I arrived at the corner, which, actually, put me on Henry Place, that subject had gotten around another corner, out of my sight. At that time, I had stopped running. And I looked to my right, in the general vicinity of where the initial group was standing, to see if -- who had stayed. At that time, there was an individual, who we later found out was Mr. Nicholson, walking.

2

THE COURT: So he's not the one that ran.

THE WITNESS: Not, initially. No, sir.

THE COURT: Okay. Okay. So someone ran.

THE WITNESS: Yes, sir.

THE COURT: From the scene. And then you came back around the scene, or whatever it is. And then that's where you saw this man.

A. (By the Witness) Yes, sir. He was right on -- he was coming just a few feet off of the sidewalk or down towards Henry Place at that time. And as I had stopped running, I was taking a few more steps. And I looked to my right where that area was. And at that time, the defendant stopped and looked at me. And I squared more to him and told him to hold up. I was in a raid vest that had Metro patches and insignia on it. And it was clearly visible. As soon as I said to hold up, he turned and ran. I, then, gave chase and told him to stop, police. That continued along the sidewalk that runs parallel to Charlotte Pike until he reached a playground type of area.

At that time, Detectives Doak and Wilder were running parallel to me, in an attempt to head -- they were a little bit ahead of me, just further up the hill. And they were able to come in contact with the defendant, initially. As they approached, they were also yelling, "stop, police." Also, in like attire as myself. As they did that, at one point, he turned to square off, like to face them. And there was a brief struggle there. That's -- as they were still fighting is when I, actually, got to the defendant. He was still struggling when he was attempting to be subdued from kicking and struggling. And as this was going on, we were asking him what his name is and what he was doing there, if he lived there. At that --

Q. Would he answer those questions?

A. At that time, he refused to give his name. He was saying that he was visiting somebody, but he wouldn't say who it was nor did he know where they were at. He, also, said he didn't have any identification on his person. At that time, it was a custodial arrest for trespassing. And –

THE COURT: He was trespassing in the Projects. Is that what, basically, you're saying?

THE WITNESS: Yes, sir.

Q. (By General Rohling) And he wouldn't give you his name. And he couldn't produce any identification.

A. That's correct.

Q. So he was placed under arrest?

A. Yes, he was.

Q. And was he searched?

A. Yes, searched incident to arrest revealed 6.1 grams of crack cocaine, I believe, in his left pocket, which field tested positive for cocaine base. And he had one thousand sixty dollars ($1,060.00), in cash, in his right pocket.

Q. Were you ever able to determine who he was?

3

A.    Yes.  It took a while because he refused to cooperate, but myself and another officer had a prior incident involving Mr. Nicholson.  And as soon as he realized that I recognized him, he recognized the both of us.  And we were able to determine his name was James Davis Nicholson.  And he, also, had outstanding warrants at that time.

On cross-examination, Detective Lockwood admitted that he did not initially recognize Defendant, had not seen Defendant earlier that night, and did not have any reports on Defendant. He further testified that Defendant was not engaged in any illegal conduct at the time he saw Defendant.

Upon consideration of this proof, the trial court denied Defendant's motion to suppress. In its written order filed December 4, 2003, the trial court summarized Detective Lockwood's testimony as follows:

At approximately midnight on July 7, 2003, Detective Lockwood, along with other Intelligence Detectives, was investigating alleged gang activity at the John Henry Hale public housing projects.  While conducting surveillance, a large group of individuals on the property were seen engaging in hand-to-hand *drug* transactions.

Detective Lockwood and other officers then approached the group for the purpose of inquiring as to whether they were on the Metropolitan Development and Housing Agency (MDHA) property lawfully.  Many individuals in the group, however, fled as Detective Lockwood and the officers neared the scene. Detective Lockwood pursued one of the individuals, but was unsuccessful in apprehending him.  Detective Lockwood then returned to the scene and noticed the Defendant walking away.  Detective Lockwood called over to the individual to "hold up."  The Defendant, however, did not comply and began to run away from the detective, as the other persons had done.

A chase ensued, which resulted in the Defendant being stopped.

(emphasis added).  The court concluded:

The Court is of the opinion that Detective Lockwood's initial attempt to speak with the Defendant did not constitute a seizure and was supported by the events that had transpired and the circumstances surrounding those events.  The Court notes that the detective was in the area of the MDHA property for the purpose of investigating gang activity.  Detective Lockwood testified that he witnessed a large group of individuals together on the property at about midnight, and that some of them were engaging in hand-to-hand *drug* transactions. Many of the individuals fled the scene when the detective approached to speak with them. Shortly thereafter, the Defendant was observed at the scene, and began to walk away as the detective approached.  The Court is of the opinion that the above facts and circumstances provided Detective Lockwood with a basis to approach the Defendant for the purpose of questioning him as to why he was on the MDHA property.

The Court is also of the opinion that the above facts and circumstances, along with the Defendant's fleeing, provided Detective Lockwood with a basis to pursue and apprehend the Defendant.

4

(citations omitted) (emphasis added).

Following the denial of his motion to suppress, Defendant pleaded guilty to possession of over .5 grams of cocaine for resale but reserved the right to appeal a certified question of law challenging the constitutionality of the seizure leading to his arrest. The other counts were dismissed, and the trial court sentenced Defendant to eight years on probation.

On appeal, the Court of Criminal Appeals reversed the trial court's denial of the motion to suppress. The majority of the court concluded that Defendant was seized when officers began pursuing him after he turned and ran upon being instructed to "hold up." The majority further concluded that neither probable cause nor reasonable suspicion supported the seizure. Dissenting, the third judge of the panel concluded that Defendant's flight, coupled with his presence in an area known for drug trafficking, provided the officers with reasonable suspicion to pursue and detain him for further inquiry, and that the officers thereafter had probable cause to arrest him for trespassing. We granted the State's application for permission to appeal.

## CERTIFIED QUESTION OF LAW

Upon entry of his guilty plea, Defendant reserved a certified question of law pursuant to Tennessee Rule of Criminal Procedure 37(b)(2)(I), which states:

> An appeal lies from any order or judgment in a criminal proceeding where the law provides for such appeal, and from any judgment of conviction . . . [u]pon a plea of guilty . . . if . . . [t]he defendant . . . explicitly reserved with the consent of the state and of the court the right to appeal a certified question of law that is dispositive of the case . . . .

In this case, Defendant's judgment of conviction refers to an agreed order which contains the following question of law:

> whether the evidence seized from the defendant in this case should have been suppressed because it was seized pursuant to the warrantless arrest of the defendant for which the police had no probable cause in violation of the 4th Amendment to the United States Constitution and Article One, Section Seven of the Tennessee Constitution as well as the Tennessee Supreme Court's decision in State of Tennessee v. Perry Thomas Randolph, 74 S.W.3d 330 (Tenn. 2002).

This statement clearly identifies "the scope and limits of the legal issue reserved." Tenn. R. Crim. P. 37(b)(2)(i)(B). The agreed order also reflects the express consent of the trial judge and the State to the question and all parties' opinion that the question is dispositive of the case. Id. at (b)(2)(i)(C), (D). We find that the certified question of law in this case is dispositive and is properly before this Court. See State v. Preston, 759 S.W.2d 647, 650 (Tenn. 1988).

## STANDARD OF REVIEW

A trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise. State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). The prevailing party is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence. Id. The

application of the law to the facts, however, is a question of law which this Court reviews de novo. State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997).

## ANALYSIS

The Fourth Amendment to the United States Constitution provides that "[t]he right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated. . . ."[1]  Similarly, article I, section 7 of the Tennessee Constitution guarantees "[t]hat the people shall be secure in their persons, houses, papers and possessions, from unreasonable searches and seizures. . . ." These constitutional protections are implicated when a police officer's interaction with a citizen impermissibly intrudes upon the privacy or personal security of the citizen. State v. Daniel, 12 S.W.3d 420, 424 (Tenn. 2000).

Police-citizen interactions are of three different types:  1) a full scale arrest which must be supported by probable cause; 2) a brief investigatory stop which must be supported by reasonable suspicion; and 3) a brief police-citizen encounter which requires no objective justification. Id. While arrests and investigatory stops are seizures implicating constitutional protections,  consensual encounters are not. "'Only when [a police officer], by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a "seizure" has occurred.'" Id. (quoting Terry v. Ohio, 392 U.S. 1, 19 n.16 (1968)).

Under both the federal and state constitutions, a warrantless seizure is presumed unreasonable, and evidence discovered as a result thereof is subject to suppression unless the State demonstrates that the seizure was conducted pursuant to one of the narrowly defined exceptions to the warrant requirement. Yeargan, 958 S.W.2d at 629 (citing Coolidge v. New Hampshire, 403 U.S. 443, 454-55 (1971)). Therefore, when a defendant seeks to suppress evidence allegedly obtained as a result of an illegal seizure, the State bears the burden of proving that its warrantless actions were justified, i.e., as a lawful investigatory stop or under some other exception to the warrant requirement.

Decisions by the United States Supreme Court make it clear that "a seizure does not occur simply because a police officer approaches an individual and asks a few questions." Florida v. Bostick, 501 U.S. 429, 434 (1991). The rule has been explained as follows:

> [L]aw enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if the person is willing to listen, or by offering in evidence in a criminal prosecution his voluntary answers to such questions. Nor would the fact that the officer identifies himself as a police officer, without more, convert the encounter into a seizure requiring some level of objective justification. The person approached, however, need not answer any question put to him; indeed, he may decline to listen to the

---

[1] The Fourth Amendment is applicable to the states through the Fourteenth Amendment. Mapp v. Ohio, 367 U.S. 643, 655 (1961).

6

questions at all and may go on his way. He may not be detained even momentarily without reasonable, objective grounds for doing so; and his refusal to listen or answer does not, without more, furnish those grounds.

Florida v. Royer, 460 U.S. 491, 497-98 (1983) (citations omitted).

Under the Tennessee Constitution, a seizure implicating constitutional protections occurs only if, in view of all of the circumstances surrounding the encounter, a reasonable person would have believed that he or she was not free to leave. Daniel, 12 S.W.3d at 425. Factors to be considered when applying this totality of the circumstances analysis include: 1) the time, place and purpose of the encounter; 2) the words used by the officer; 3) the officer's tone of voice and general demeanor; 4) the officer's statements to others who were present during the encounter; 5) the threatening presence of several officers; 6) the display of a weapon by an officer; and 7) the physical touching of the person of the citizen. Id. at 425-26. This analysis "is designed to assess the coercive effect of police conduct, taken as a whole, rather than to focus on particular details of that conduct in isolation." Id. at 426 (quoting Michigan v. Chesternut, 486 U.S. 567, 573 (1988)). We recognized in Daniel that an encounter typically becomes a seizure

if an officer: (1) pursues an individual who has attempted to terminate the contact by departing; (2) continues to interrogate a person who has clearly expressed a desire not to cooperate; (3) renews interrogation of a person who has earlier responded fully to police inquiries; (4) verbally orders a citizen to stop and answer questions; (5) retains a citizen's identification or other property; (6) physically restrains a citizen or blocks the citizen's path; (7) displays a weapon during the encounter.

12 S.W.3d at 426.

In Daniel, we concluded that an officer's conduct in merely approaching the defendant in the parking lot of a convenience store, inquiring what was going on, and asking to see his identification did not amount to a seizure. 12 S.W.3d at 427. The consensual encounter became a seizure, however, when the officer retained the defendant's identification to run a warrants check. Id. We reasoned that "[w]ithout his identification, [the defendant] was effectively immobilized." Id.

We subsequently clarified the definition of seizure in State v. Randolph, 74 S.W.3d 330 (Tenn. 2002). In that case, a police officer responded to a possible burglary in progress at an automobile parts store. As the officer drove toward the location, he noticed the defendant riding a bicycle toward him. As the defendant neared him, the officer activated the blue lights on his patrol car, rolled down his window, and ordered the defendant to stop. Passing within three feet of the patrol car, the defendant looked at the officer but kept riding. When the officer again asked the defendant to stop, the defendant increased his speed.

At that point, the officer turned his car around and pursued the defendant, apprehending him a short time thereafter. The officer subsequently testified that he was not looking for anyone while driving toward the burglary location, that there was nothing to alert him that the defendant was involved in the burglary, and that he stopped the defendant on a "hunch." Id. at 333.

7

Based on these facts, we held that "the defendant was seized when the officer activated the blue lights on his patrol car, ordered the defendant to stop, and pursued him for several blocks." Id. at 338. We reasoned that, although the officer "did not initially draw a weapon or make physical contact," he seized the defendant when he "made a show of authority by activating the blue lights on his patrol car and instructing [the defendant] to stop." Id.

In Randolph, 74 S.W.3d at 337, we declined to adopt the holding of California v. Hodari D., 499 U.S. 621 (1991). In the Hodari D. case, a majority of the United States Supreme Court limited its earlier decision in United States v. Mendenhall, 446 U.S. 544, 554 (1980), and concluded that a person is seized for purposes of the Fourth Amendment only when an officer uses physical force to detain a person or when a person submits or yields to a show of authority by the officer. 499 U.S. at 627-29. Under the standard in Hodari D., if a person flees, he is seized only when he is caught. Id. at 629. We held in Randolph that article I, section 7 of the Tennessee Constitution, as interpreted by this Court in Daniel as well as other seizure cases decided by this Court after 1991, clearly required that we reject the "narrow, oft-criticized standard in Hodari D." 74 S.W.3d at 337. We rejected the Hodari D. holding in part on finding its analysis "flawed for practical reasons and . . . subject to potential abuse by officers who pursue a subject without reasonable suspicion and use a flight or refusal to submit to authority as reason to execute an arrest or search." Id. at 336. Therefore, whether a person has been physically restrained or has stopped or yielded to a show of authority by the police is not dispositive of whether there has been a seizure under the Tennessee Constitution. Id. at 337. Instead, we apply the well-established totality of the circumstances analysis and the standard of whether a reasonable person would have believed that he or she was not free to leave. Id.

The State contends that Randolph does not support the conclusion of the Court of Criminal Appeals in this case that Defendant was seized when Detective Lockwood told him to "hold up."[2] We agree that a police officer who simply instructs a pedestrian to "hold up" does not, without more, commit a seizure of that pedestrian. The instruction "hold up" is a request to stop. By itself, a request to stop, even when issued by a uniformed police officer, would not communicate to a reasonable person that he or she was not free to simply ignore the officer's request and keep walking.

Other states that, like Tennessee, have rejected the Hodari D. standard on state constitutional grounds, have concluded that similar encounters do not constitute a seizure. See, e.g., Commonwealth v. Stoute, 665 N.E.2d 93, 98 (Mass. 1996) (acknowledging no seizure occurred when officer initially asked defendant to "hold up a minute"); People v. Bora, 634 N.E.2d 168, 170-71 (N.Y. 1994) (holding no seizure occurred when, after defendant began to walk away, officer directed him to "stop"). While the language and conduct expressed by the police in initially approaching a citizen could be so forceful and intimidating that, standing alone, it effectuates a seizure, the simple statement "hold up" does not rise to that level.

---

[2]A close reading of the majority opinion issued by the Court of Criminal Appeals reveals that the majority did not conclude that the seizure occurred upon the officer's uttering the words, "hold up," but upon the officer's pursuit of Defendant after Defendant turned and ran.

We turn now to the events following Detective Lockwood's directive. Upon being told to "hold up," Defendant turned and ran away from the detective. Detective Lockwood immediately gave chase, simultaneously issuing the order, "stop, police." Two other officers joined in the pursuit. The State does not dispute that Defendant was seized for purposes of article I, section 7 of the Tennessee Constitution when the officers pursued him yelling "stop, police."[3] We must, therefore, determine whether this seizure was supported by reasonable suspicion so as to justify an investigatory stop.

An officer conducting an investigatory stop "must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [the] intrusion." Terry, 392 U.S. at 21. Whether reasonable suspicion for an investigatory stop exists must be evaluated under the totality of the circumstances known to the police at the time of the stop. See State v. Binette, 33 S.W.3d 215, 218 (Tenn. 2000).

We take this opportunity to stress to every court considering a motion to suppress the vital importance of a close and critical examination of the actual proof adduced at the suppression hearing.[4] In this case, the trial court's order denying the motion and both opinions from the intermediate court refer to Detective Lockwood's having observed hand-to-hand *drug* transactions immediately before seeing Defendant approaching the scene. Detective Lockwood testified that he and his fellow detectives "observed a large crowd of individuals" and "witnessed various hand-to-hand transactions amongst the group." Detective Lockwood never described these transactions as involving drugs, however. Indeed, he testified that, after witnessing these transactions, "the decision was made to speak with several of the individuals, in an attempt to gather *gang* intelligence." (emphasis added). Whatever the transactions were, Detective Lockwood and his colleagues apparently decided that they were connected to some form of gang activity rather than specifically to drug transactions. As this Court is unfortunately all too aware, gang activity is not limited to illegal drug trafficking.

Although Detective Lockwood never testified as to the nature of these hand-to-hand transactions, the trial court made a specific finding in its order denying Defendant's motion to suppress that "while [the officers were] conducting surveillance, a large group of individuals on the property were seen engaging in hand-to-hand *drug* transactions." (emphasis added). Later in its order the trial court stated, "Detective Lockwood testified that he witnessed a large group of individuals together on the property at about midnight, and that some of them were engaging in hand-to-hand *drug* transactions." (emphasis added). The trial court relied on these "drug" transactions as part of the circumstances which "provided Detective Lockwood with a basis to pursue and apprehend the Defendant," thereby rendering the seizure constitutionally valid.

Both the majority and the dissenting opinions from the Court of Criminal Appeals recite and rely upon the trial court's description of the activity observed by the detectives as "hand-to-

---

[3] Inasmuch as Defendant fled, he was not seized for purposes of the Fourth Amendment until he was physically restrained by the officers. See Hodari D., 499 U.S. at 629.

[4] This examination will also include the evidence introduced at trial, if the appeal is not heard prior to trial. State v. Henning, 975 S.W.2d 290, 299 (Tenn. 1998).

hand drug transactions." The dissent, particularly, utilized this finding by the trial court in opining that Defendant's seizure passed constitutional muster. The dissenting member of the Court of Criminal Appeals additionally characterized the area where the encounter occurred as "known for drug trafficking." This conclusion is likewise unsupported by the proof adduced at the suppression hearing. Nevertheless, the dissent concluded: "the encounter occurred late at night in an area known for drug trafficking. Only moments earlier, Detective Lockwood . . . had witnessed a number of hand-to-hand drug transactions. . . . It is my opinion that when the defendant ran, the Detective had reasonable suspicion to pursue and further investigate."

Because the determination of the constitutionality of a seizure is so fact-intensive, we cannot overstate the importance of an accurate assessment of the proof as drawn from the actual evidence adduced at the trial court level. The proof in this case simply does not support a finding that the detectives observed drug transactions being conducted, or that the area was known for drug trafficking. We must, therefore, assess Detective Lockwood's conduct in light of his actual testimony.

As far as the record indicates, Detective Lockwood seized Defendant on the basis of three observed facts: 1) Defendant's proximity to an area being investigated for gang activity; 2) Defendant's refusal to "hold up" when told to do so; and 3) Defendant's rapid flight from his encounter with Detective Lockwood. With respect to the first of these observed facts, we hold that an individual's proximity to an area being investigated for gang activity is not sufficient, without more, to justify an investigatory stop. See Brown v. Texas, 443 U.S. 47, 52 (1979) (holding that defendant's presence in neighborhood frequented by drug users was not, in and of itself, a basis for concluding he was engaged in criminal conduct); State v. Lawson, 929 S.W.2d 406, 408-09 (Tenn. Crim. App. 1996) (holding that one's presence in a high crime area late at night, without more, will not justify an investigatory stop). And, as previously indicated, an individual's refusal to accede to a police officer's request to stop and chat will not provide grounds for a constitutionally valid seizure. Thus, we are left with the significance of Defendant's flight from Detective Lockwood.

Relying on Illinois v. Wardlow, 528 U.S. 119 (2000), the State argues that Defendant's flight is a pertinent factor in determining reasonable suspicion. In Wardlow, the defendant fled upon seeing a vehicle containing uniformed police officers patrolling an area known for heavy narcotics trafficking. The officers chased and apprehended the defendant who was then found to be in illegal possession of a weapon. In upholding the defendant's seizure, the United States Supreme Court acknowledged that an individual's presence in an area of expected criminal activity, without more, is not enough to support a reasonable, particularized suspicion that the person is committing a crime. Id. at 124. The Court noted, however, that a location's characteristics are relevant in determining whether the circumstances are sufficiently suspicious to warrant further investigation, id., and that nervous, evasive behavior is also a pertinent factor in determining reasonable suspicion. Id. The Court emphasized that "[h]eadlong flight – wherever it occurs – is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such." Id. Based on the defendant's unprovoked flight in a high crime area, the Court concluded that the officer was justified in suspecting that the defendant was involved in criminal activity and, therefore, in investigating further. Id. at

We agree with the United States Supreme Court that a location's characteristics may be relevant to amassing reasonable suspicion. We also agree that "nervous, evasive behavior" by someone may contribute to the conclusion that further investigation is warranted. We further agree that "headlong flight" is evasive behavior in the extreme. We decline to conclude, however, that flight from a police officer's demand to "hold up" is "certainly suggestive" of wrongdoing. Rather, we quote with approval from the majority decision by the Court of Criminal Appeals in this case:

> while we do not wish to encourage flight from officers . . . , we realize from a practical standpoint that flight does not always amount to reasonable suspicion. In fact, innocent reasons for flight abound in high crime areas, including: fear of retribution for speaking to officers, unwillingness to appear as witnesses, and fear of being wrongfully apprehended as a guilty party.

We are particularly mindful of the potential for "retribution for speaking to officers" in an area being investigated for gang activity.

Detective Lockwood did not testify about the location's characteristics in this case, other than that it was a public housing area being investigated for gang activity. Detective Lockwood did not testify that he witnessed criminal activity immediately prior to seeing Defendant, or that Defendant was behaving in some manner indicative of criminal conduct. Defendant simply happened on the scene after Detective Lockwood had unsuccessfully chased other persons. When Detective Lockwood told Defendant to "hold up," Defendant turned and ran. At that point, Detective Lockwood gave chase and ordered, "stop police," thereby seizing Defendant. Based on the proof in the record before us, Detective Lockwood simply did not have at that time specific and articulable facts sufficient to support an inference of criminality and to provide him with reasonable suspicion to seize Defendant. The State having failed to carry its burden of proving that Detective Lockwood's seizure of Defendant upon his flight was supported by reasonable suspicion, we are constrained to declare the seizure invalid.

## CONCLUSION

We hold that, based on the totality of the circumstances indicated in the record before us, Detective Lockwood's seizure of Defendant was unreasonable under article I, section 7 of the Tennessee Constitution. Accordingly, the trial court erred when it denied Defendant's motion to suppress. We therefore affirm the judgment of the Court of Criminal Appeals. Defendant's conviction is vacated and the charges against him are dismissed.

It appearing that Defendant, James D. Nicholson, is indigent, costs of this appeal are taxed to the State of Tennessee.

_____
CORNELIA A. CLARK, JUSTICE