# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### June 22, 2010 Session

## STATE OF TENNESSEE v. JAMES PORTER MCFARLAND

**Direct Appeal from the Criminal Court for Wilson County**
**No. 08-CR-621     John D. Wootten, Jr.,  Judge**

_____

**No. M2009-01657-CCA-R3-CD - Filed December 3, 2010**

_____

The defendant, James Porter McFarland, presents for our review a certified question of law pursuant to Tennessee Rule of Criminal Procedure 37(b)(2). The defendant pleaded guilty to driving under the influence, second offense. As a condition of his guilty plea, the defendant reserved a certified question of law challenging the denial of his motion to suppress based upon his allegation that police subjected him to an unconstitutional investigative stop. Following our review, we affirm the judgment of the trial court denying the defendant's motion to suppress.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

J.C. MCLIN, J., delivered the opinion of the court, in which JERRY L. SMITH and THOMAS T. WOODALL, JJ., joined.

G. Frank Lannon (at trial and on appeal), Lebanon, Tennessee, for the appellant, James P. McFarland.

Robert E. Cooper, Jr., Attorney General and Reporter; Benjamin A. Ball, Assistant Attorney General; Tom P. Thompson, Jr., District Attorney General; and Linda Walls, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### Background

On July 15, 2008, the Wilson County Grand Jury indicted the defendant, James Porter McFarland, for driving under the influence of an intoxicant, second offense, a Class A misdemeanor. On January 7, 2009, the defendant filed a motion to suppress any evidence

gathered from the police officers' stop of the defendant's vehicle. The trial court held an evidentiary hearing on the motion to suppress on April 7, 2009.

At the suppression hearing, Officer Scott Fulton, with the Mt. Juliet Police Department, testified that he was working in the "south patrol zone" on January 19, 2008, when he came upon the defendant. A bank teller had called the police and reported that the defendant might have been driving while intoxicated. The bank teller informed the police that the defendant was driving a silver Chevrolet Corvette. Officer Fulton spotted a vehicle traveling on Mt. Juliet Road that matched the description given by the teller, and he followed it.

Officer Fulton described Mt. Juliet Road as a three-lane road that was under construction. The left and center lanes continued south on Mt. Juliet Road, and the right lane was a turn lane to enter onto the interstate. The defendant was traveling in the center lane. While he was following the defendant's vehicle, Officer Fulton twice observed the defendant weave his vehicle outside his lane of traffic. According to Officer Fulton, they were

> at a dead stop at the traffic light at Western Drive[,] which is where West Wilson Middle School is. [Officer Fulton] was in the left lane three or four cars back, and [the defendant] was the lead vehicle in the right lane and there were, again, three or four cars behind him. When the light turned green, as [the defendant] was pulling away from that intersection, when he was weaving, he weaved [sic] over into the left lane and back to the right lane and over into the left lane again and back into the right lane.

Because of the lane of traffic in which the defendant was driving, Officer Fulton assumed that the defendant would continue to drive south on Mt. Juliet Road. However, the defendant activated his right turn signal and turned from the center lane onto the interstate's entry ramp.

Officer Fulton said that he would normally turn on the rear blue lights of his patrol car to indicate that he needed to merge into another lane of traffic; however, he could not "say one hundred percent that [he] did that in this case[.]" He further explained that he would turn on the rear blue lights "to get behind somebody without alerting the person [whom he is] trying to get behind." Here, he wanted to observe the defendant, but he did not want the defendant to stop in the middle of the intersection. He was not able to get directly behind the defendant until just before the defendant turned to get onto the interstate. Officer Fulton waited until he and the defendant passed the concrete barriers that were along the side of the interstate before he signaled for the defendant to pull over his vehicle.

Officer Fulton had a digital camera system in his patrol car. He stated that the camera system was "set to record and it buffer[ed], so it capture[d] [thirty] seconds prior to activation of video, but not audio." Officer Fulton could turn on the camera system either manually by pressing a button or automatically by activating the front blue lights on the patrol car. When he recorded the defendant, Officer Fulton had manually activated the camera. Officer Fulton recorded the defendant, and the prosecution played the tape for the court.

On cross-examination, Officer Fulton testified that the defendant's making an improper right turn onto the interstate entry ramp was part of the reason that he stopped him. Regarding the defendant weaving his vehicle, Officer Fulton explained that he "crossed into the lane of traffic where other vehicles were, but it was the same direction of traffic . . . ." However, he agreed that the defendant's weaves did not cause him to active the blue lights on his patrol car. Officer Fulton also agreed that he did not attempt to pull over the defendant until they were "well down the on-ramp after [the defendant had] executed the right[-]hand turn[.]" The defendant did not weave or commit any other traffic violations while driving on the ramp to the interstate.

Officer Fulton said that the lanes in which he and the defendant were traveling had not been "changed, moved, [or] redesignated [sic]" due to the construction but he could not recall whether signs clearly marked the turning lane to enter the interstate. He stated that there was a large enough gap between the first vehicle in the right-hand lane and the vehicle behind it to allow a vehicle to turn onto the interstate. However, because the second vehicle had to stop to allow Officer Fulton and the defendant to pull in front of it, he disagreed that the gap was large enough for two vehicles to make the right hand turn without interfering with or endangering the second vehicle. Upon further questioning, Officer Fulton agreed that "[t]here was sufficient space between the first vehicle in the turning lane . . . [and] the second vehicle for both [him] and [the defendant] to make right[-]hand turns." Officer Fulton did not see the second vehicle attempt to stop or begin to move forward while he and the defendant were attempting to turn right. Officer Fulton also did not see the defendant speeding. According to Officer Fulton, there was approximately one mile between the spot where he first observed the defendant and where he activated the camera system. He further stated that the distance between the entry ramp to the interstate and where he pulled the defendant over was approximately a half mile.

On redirect examination, Officer Fulton explained that the police department received the information about the defendant's driving from the bank teller after the defendant had driven up to the drive-thru window at the bank. The bank teller believed that the defendant might have been driving while intoxicated so she called the police department and gave them a description of his vehicle. Officer Fulton spotted the defendant's vehicle about three miles from the bank where the teller worked. The patrol car camera was on the center of the

windshield and captured primarily vehicles directly in front of the patrol car; but it also recorded vehicles on the left and right.

After hearing the proof, the trial court denied the defendant's motion to suppress. In doing so, the court noted that the video alone was not enough to justify the stop. However, considering the bank teller's phone call and the corroboration of that phone call by Officer Fulton's undisputed observations, the trial court found that there was reasonable suspicion for Officer Fulton to stop the defendant.

The defendant pleaded guilty to driving under the influence, second offense, and the court sentenced him to serve eleven months and twenty-nine days, suspended after service of forty-five days in the county jail. As part of his plea agreement, the defendant reserved this certified question of law:

> Whether the stop of the Defendant's vehicle was illegal and in violation of the Defendant's State and Federal Constitutional Rights guaranteed by Article 1 Section 8 of the Tennessee Constitution; the 4th Amendment of the United States Constitution, Article 1 Section 7 of the Tennessee Constitution; Article 1 Section 8 of the Tennessee Constitution; and the 14th Amendment to the United States Constitution because the stop lacked the requisite reasonable suspicion for the officer to initiate a stop of the Defendant's vehicle, requiring suppression of the stop consistent with the Defendant's Motion to Suppress, which was denied by the Trial Court after hearing proof.

**Analysis**

"When evaluating the correctness of a trial court's ruling on a pretrial motion to suppress, the court on appeal must uphold the trial court's findings of fact unless the evidence preponderates otherwise." *State v. Williams,* 185 S.W.3d 311, 314 (Tenn. 2006). "Questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." *State v. Lawrence,* 154 S.W.3d 71, 75 (Tenn. 2005) (quoting *State v. Odom,* 928 S.W.2d 18, 23 (Tenn. 1996)). However, appellate review of a trial court's conclusions of law and application of law to facts on a motion to suppress evidence is a *de novo* review. *See State v. Nicholson,* 188 S.W.3d 649, 656 (Tenn. 2006); *State v. Walton,* 41 S.W.3d 75, 81 (Tenn. 2001).

Both the Fourth Amendment to the United States Constitution and Article I, section 7 of the Tennessee Constitution protect individuals from unreasonable searches and seizures. These constitutional provisions are designed "to prevent arbitrary and oppressive interference

with the privacy and personal security of individuals." *State v. Daniel,* 12 S.W.3d 420, 424 (Tenn. 2000) (quoting *INS v. Delgado*, 466 U.S. 210, 216 (1984)). Therefore, "[u]nder both the federal and state constitutions, a warrantless seizure is presumed unreasonable, and evidence discovered as a result thereof is subject to suppression unless the state demonstrates that the seizure was conducted pursuant to one of the narrowly defined exceptions to the warrant requirement." *Nicholson,* 188 S.W.3d at 656; *see also State v. Binette,* 33 S.W.3d 215, 218 (Tenn. 2000). One such exception is a brief investigatory stop by a law enforcement officer if the officer has a reasonable suspicion, based upon specific and articulable facts, that a person has either committed a criminal offense or is about to commit a criminal offense. *Terry v. Ohio*, 392 U.S. 1, 21 (1968); *Binette,* 33 S.W.3d at 218. This narrow exception has been extended to the investigatory stop of vehicles. *See United States v. Brignoni-Ponce*, 422 U.S. 873, 881 (1975); *State v. Watkins,* 827 S.W.2d 293, 294 (Tenn. 1992). Reasonable suspicion is something more than an "inchoate and unparticularized suspicion or hunch." *Terry,* 392 U.S. at 27. In evaluating whether a police officer has a reasonable suspicion, supported by specific and articulable facts, a court must consider the totality of the circumstances. *Binette,* 33 S.W.3d at 218. Those circumstances may include the personal observations of the police officer, information obtained from other officers and agencies, information obtained from citizens, and the pattern of operation of certain offenders. *Watkins,* 827 S.W.2d 294. Additionally, the court must consider any rational inferences and deductions that a trained officer may draw from those circumstances. *Id.*

In this appeal, the defendant argues that police officers stopped his vehicle without the requisite reasonable suspicion to believe that he had committed or was about to commit a crime. The defendant argues that neither the bank teller's report nor Officer Fulton's observations amounted to reasonable suspicion to support the warrantless stop of his vehicle. In rebuttal, the state argues that, given the totality of the circumstances, Officer Fulton had reasonable suspicion to believe that the defendant had either committed or was committing a crime.

In the light most favorable to the state, Officer Fulton testified that the police received a phone call alerting them that the defendant might have been driving while intoxicated. Officer Fulton spotted the defendant's vehicle and followed him. While following him, he twice observed the defendant weave his vehicle outside his lane of travel and into the next lane. He also observed the defendant make a right-hand turn onto the interstate entry ramp from the center lane. The trial court found that while any of these factors alone might not have amounted to reasonable suspicion, the totality of the circumstances - the bank teller's call and the corroboration of the phone call by Officer Fulton's undisputed observations - amounted to reasonable suspicion to justify Officer Fulton stopping the defendant's vehicle. In our view, the evidence does not preponderate against the trial court's findings. We conclude that Officer Fulton had reasonable suspicion, supported by specific and articulable

facts, to support the investigative stop of the defendant's vehicle. Accordingly, we affirm the judgment of the trial court denying the motion to suppress.

## Conclusion

Based on the foregoing reasons, we affirm the trial court's denial of the defendant's motion to suppress.

_____
J.C. McLIN, JUDGE