# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs October 7, 2014

## STATE OF TENNESSEE v. DESMOND SYKES

**Direct Appeal from the Criminal Court for Shelby County**
**No. 13-00174    Carolyn Wade Blackett, Judge**

---

**No. W2013-02005-CCA-R3-CD  - Filed February 25, 2015**

---

A Shelby County Criminal Court Jury convicted the appellant, Desmond Sykes, of two counts of aggravated robbery, a Class B felony, and the trial court sentenced him to an effective nine years in confinement.  On appeal, the appellant contends that the trial court erred by denying his motion to suppress his statement to police and evidence obtained pursuant to his arrest because the police lacked probable cause for the arrest.  Based upon the record and the parties' briefs, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court are Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the Court, in which CAMILLE R. MCMULLEN and TIMOTHY L. EASTER, JJ., joined.

Andrew R. E. Plunk (at trial and on appeal) and Claiborne Ferguson (at trial), Memphis, Tennessee, for the appellant, Desmond Sykes.

Robert E. Cooper, Jr., Attorney General and Reporter; Tracy L. Alcock, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Katie Ratton and Anita Spinetta, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### I.  Factual Background

The appellant does not contest the sufficiency of the evidence.  Nevertheless, because we may consider the proof at trial in our evaluation of the trial court's ruling on the motion to suppress, we will summarize the evidence presented at trial.

Diante Galmore testified that he met the appellant when they were young boys living in Mississippi and that they "used to hang." At some point, Galmore's family moved to Memphis. In early 2012, the appellant came to Memphis, and he and Galmore "went looking for jobs together." Galmore obtained employment at a Zaxby's restaurant, and the appellant started working at Dunkin Donuts. Subsequently, the appellant began living with Galmore and Galmore's mother.

Galmore testified that on the night of August 27, 2012, he worked in the kitchen at Zaxby's and wore basketball shorts and a shirt that was "kinda dark." The restaurant closed at 10:00 p.m., but cleanup took "40 minutes or more." The appellant owned a white Grand Marquis with a Mississippi license plate and usually picked up Galmore from Zaxby's. However, that night, the appellant walked to Zaxby's. Galmore said that he assumed the appellant "ran out of gas or something" and that "some twins," who worked at Zaxby's with Galmore, drove him and the appellant to the Stonebridge Apartments. Galmore and the appellant did not live in Stonebridge, but the appellant's car was parked there. The twins dropped off the appellant and Galmore at the appellant's car.

Galmore testified that the appellant said he had "robbed some people," that he could not find his key to the Grand Marquis, and that he had left the key in "[t]he car he had got." The appellant did not say how he obtained the car. The appellant wanted to exchange clothes with Galmore, and Galmore agreed. Galmore said that he switched shirts and shoes with the appellant and that he did so because he "wasn't thinking at the time" and "didn't think we would get caught." Galmore said he told the appellant that he was not going to get into trouble with the appellant.

Galmore testified that after he and the appellant switched clothes, they walked to a nearby Citgo convenience store. When they came out of the store, three or four police officers "grabbed" them. The officers put them into separate patrol cars, and Galmore told the officers that he had not done anything. The police transported Galmore to the police department, he waived his rights, and he gave a statement.

On cross-examination, Galmore acknowledged that after he gave his statement, he was released, but the appellant was detained. He also acknowledged that he exchanged clothes with the appellant, knowing that the appellant had stolen a car. He said he thought he was helping the appellant. Galmore acknowledged that the appellant's girlfriend lived in Stonebridge and that the appellant "[hung] out" there. However, the appellant's car was not parked in front of his girlfriend's apartment on the night of August 27. Galmore said that he was "just getting off work a 10:40" and that he and the appellant did not arrive at the apartment complex "until 11 or something like that." He denied changing his story in order to make it appear that he arrived at the apartment complex after the crime. He acknowledged

that in his statement to the police, he did not mention switching shoes with the appellant. He said he "told them about it though." He did not remember if he was wearing a hat that night. The appellant's Grand Marquis was unlocked, and Galmore and the appellant exchanged their shirts and shoes in the car, not the Citgo bathroom.

On redirect examination, Galmore acknowledged that in his statement to the police, he claimed that the appellant arrived at Zaxby's about 10:40 p.m. Galmore said he and the appellant left Zaxby's with the twins about 10:45 p.m. On recross-examination, Galmore testified that they arrived at the apartment complex about "10:50 something."

Victoria Johnson testified that on August 27, 2012, she lived in the Stonebridge Apartments with her family and worked at Taco Bell from 3:30 p.m. to 10:00 p.m. She left the restaurant about 10:05 p.m. and drove home, which took about four minutes. When Johnson arrived in the parking lot near her apartment, her father met her outside, which he did every night. As Johnson and her father entered the breezeway to their apartment, a man ran toward them from the left. Johnson said he was holding a gun in his right hand and told them, "[G]ive me your stuff or I'll kill you." Johnson said the lighting in the area was "dim" and behind the man so that she could see his clothing but not his facial features. She described him as about twenty years old, thin, and "six [foot] something." He was wearing a baseball cap with a flat bill, a gray shirt with a blue logo, basketball shorts, and black basketball shoes.

Johnson testified that she gave the man the keys to her 2004 Saturn Ion and her cellular telephone. Her father gave the man his phone. Johnson went into her apartment, and her mother telephoned the police. When the police arrived, Johnson described the robber to them, and they used Johnson's "Track My Phone App" to locate her phone in the parking lot of Zaxby's. Later that night, Johnson went to the police department and looked at a photograph array but could not identify the robber.

Freddericus Deer testified that on the night of August 27, 2012, he met his then seventeen-year-old daughter, Victoria Johnson, in the parking lot near their apartment. As they walked into the breezeway, a man ran up to them, showed them a gun, and told them, "[G]ive me what you got." Johnson gave the man her cellular telephone and car keys and ran into the apartment. Deer walked away and heard the robber fumbling with something. Deer went into the apartment and got his car keys, returned to the parking lot to look for the robber, and noticed that his daughter's car was gone. Deer drove around looking for the robber but could not find him.

Deer testified that the robber was a young African-American male; about six feet, one inch tall; and very thin. The robber was wearing a gray and blue shirt and shorts. Deer said

that the lighting was "very dark" and that he could see the robber's face "to a point." He said that after the robbery, the police showed him several photograph arrays and that he "picked somebody out that was very similar." However, he was unable to make a positive identification.

Officer Michael Staten of the Memphis Police Department (MPD) testified that on August 27, 2012, he responded to a robbery call at the Stonebridge Apartments. The call was received about 10:30 or 10:40 p.m., and Officer Staten arrived within four or five minutes. Two cellular telephones had been taken, and Officer Staten learned that Johnson's phone contained software for locating her phone. Using his own phone and Johnson's information, Officer Staten tracked Johnson's phone to an area behind Zaxby's. He went to that location and found the phone in some tall grass.

Officer John Condon of the MPD testified that he responded to the robbery. Officer Staten had tracked one of the stolen telephones to an area behind Zaxby's, and the police "saturated the area around the phone" with officers. The robber had been described as an African-American male; dark complected; about six feet, two inches tall; and wearing a gray shirt, dark-colored shorts, and some type of hat. Officer Condon pulled into the Citgo parking lot next to Zaxby's and saw two African-American males. One of them "matched that description, dark complexion, hat, gray shirt with shorts."

Officer Condon testified that he and another officer "detained" the two males, who were Galmore and the appellant, and put them into separate patrol cars. Galmore was put into Officer Condon's car and was wearing a hat, a gray shirt, and dark-colored shorts. The appellant was wearing an orange t-shirt. Officer Condon said Galmore and the appellant were dark complected and about the same height. The State asked Officer Condon why he put both of the men into patrol cars, and he stated, "[The] gentleman that was matching the description [was] in the area of an item that was taken in the robbery. The other gentleman was standing right next to him. That's basically the only reason."

On cross-examination, Officer Condon acknowledged that he had information about only one suspect. On redirect examination, he acknowledged that Galmore and the appellant were about the same age, height, and build.

Officer Carlo Foster of the MPD testified that he responded to the Stonebridge Apartments on August 27, 2012. He left the complex with Officer Staten, traveled to the area behind Zaxby's, and found Johnson's car parked in front of a house just north of Zaxby's. He noticed that whoever had parked the car there could have walked through a back yard and toward Highway 64 and Zaxby's. Officer Foster got out of his patrol car and could see officers looking for Johnson's phone behind the restaurant.

-4-

Sergeant Kelvin Hailey of the MPD testified that he was one of the investigators for this case and took Johnson's statement. On the afternoon of August 28, he questioned the appellant. The appellant waived his rights and admitted that he committed the robbery. He said he did so alone, used a BB gun, and took a car, keys, and a phone. He said he did not take anything from the male victim. The appellant stated that after the robbery, he parked the car "around the corner from Zaxby's" and "tossed the gun in the grass." The appellant then went to Zaxby's and "tossed" the phone and keys. He told Sergeant Hailey that he committed the robbery because he was "messed up," having mechanical problems with his car, and wanted to get home to his family in Mississippi.

On cross-examination, Sergeant Hailey testified that he also interviewed Galmore and that the MPD did not record suspect interviews. Officers looked for the BB gun and keys but never found them, and Sergeant Hailey never went to Zaxby's to identify or question "the twins." He said that at the time of the appellant's interview, the appellant was wearing a Tennessee Volunteer shirt, knee-length short pants, and off-white tennis shoes. The appellant was not wearing a hat. Sergeant Hailey acknowledged that he showed Johnson and Deer photograph arrays containing Galmore's photograph. He did not show them arrays containing the appellant's photograph.

On redirect examination, Sergeant Hailey testified that he spoke with Galmore after he interviewed the appellant. Galmore said he was not involved in the robbery and was released.

At the conclusion of the State's case, the jury convicted the appellant as charged of two counts of aggravated robbery, a Class B felony. After a sentencing hearing, the trial court sentenced him to nine years for each conviction to be served concurrently.

## II. Analysis

The appellant contends that the trial court erred by failing to suppress his statement to police and any other evidence obtained after his illegal arrest. The appellant claims that the police lacked probable cause for the arrest because they had received information that only one man was involved in the robbery and because he did not match the description of the robber. The State argues that the trial court properly denied the appellant's motion to suppress. We agree with the State.

Before trial, the appellant filed a motion to suppress his statement and any evidence seized pursuant to his arrest on the basis that the police lacked probable cause for the warrantless arrest. At the suppression hearing, Officer Staten testified that on August 27, 2012, he was near the Stonebridge Apartments when he heard about the robbery. He went

to the scene, spoke with a victim, and learned that an iPhone had been taken. Officer Staten had the Find My iPhone app on his own phone and used the victim's information to track her phone. Officer Staten's phone showed that the victim's phone was across the street from the apartment complex, near a gas station and a Zaxby's. Officer Staten went to that location and found the phone. By that time, other officers had already arrested Galmore and the appellant.

On cross-examination, Officer Staten testified that he arrived at the victims' apartment about five to ten minutes after the robbery. The female victim said she had been robbed by one African-American male with a gun and described the robber as wearing a gray shirt, basketball shorts, black socks, a dark baseball cap, and black shoes. Officer Staten began tracking the iPhone within ten minutes of his arrival at the apartment and found the phone two to three hundred yards away.

Officer Staten testified that after he found the phone, he went to the Citgo and saw the appellant in the back of a patrol car. Officer Staten went into the store and spoke with his partner, who told him that the appellant and Galmore had changed clothes in the store. Officer Staten spoke with the store clerk, and the clerk confirmed that the appellant and Galmore had gone into the bathroom together and had come out of the bathroom wearing each other's clothing. The clerk claimed that the incident had been recorded, but Officer Staten never saw the video.

Officer Condon testified that on the night of August 27, 2012, the police department dispatched information about the robbery. The robber was described as an African-American male; about six feet, two inches tall; dark complected; and wearing a gray shirt, dark basketball shorts, black socks, and a baseball cap. Other officers were already at the victims' apartment and reported that they had tracked a stolen cellular telephone to an area behind Zaxby's, which was across the street from the apartment complex.

Officer Condon testified that he pulled into the gas station next to Zaxby's and saw two African-American males. He and another officer approached them, asked them for identification, "patted them down" for weapons, and put them into separate patrol cars. Galmore, who was sitting in Officer Condon's car, told Officer Condon that he and the appellant had switched clothes and that the appellant had taken a car from the apartment complex.

On cross-examination, Officer Condon acknowledged that he had not received any information about the robber's facial features, hair, scars, or tattoos. When he pulled into the gas station parking lot, the area was well lit. The robber allegedly had used a weapon during the robbery, but Officer Condon did not see anything to indicate that the appellant was

armed. Nevertheless, he and the other officer patted down Galmore and the appellant and put them into patrol cars. He acknowledged that the cars' rear doors did not open from the inside. Officer Condon waited for other officers to arrive and spoke with Galmore about ten to fifteen minutes after Galmore had been placed in the patrol car. At that point, Galmore told Officer Condon that he and the appellant had switched clothes. Officer Condon had never met Galmore prior to that night and never spoke with the store clerk. He acknowledged that Galmore's clothing matched that of the alleged robber.

On redirect examination, Officer Condon acknowledged that Galmore and the appellant were "clearly together" in the parking lot. Both of them were African-American and tall. Both of them matched the physical description of the robber, but only Galmore's clothing matched that of the robber.

At the conclusion of the hearing, counsel for the appellant argued that the police arrested the appellant when they put him into the patrol car and that the officers lacked probable cause for the arrest because they had information that only one person had committed the crime and because the specific description of that person did not match what the appellant was wearing at the time of his arrest. The trial court, noting that the crime had involved a weapon and that Galmore and the appellant were walking together in close proximity to the location of the stolen cell phone, ruled that the officers were justified in detaining both men while they investigated the robbery. The court found that the amount of time, fifteen minutes, it took for Officer Condon to learn that Galmore and the appellant had switched clothes was reasonable. In short, the trial court concluded that the officers "had reasonable suspicion to stop and seize Defendant" and denied the motion to suppress.

In reviewing a trial court's determinations regarding a suppression hearing, "[q]uestions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). Thus, "a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." Id. Nevertheless, appellate courts will review the trial court's application of law to the facts purely de novo. See State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001). Furthermore, the prevailing party is "entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence." Odom, 928 S.W.2d at 23. We note that "in evaluating the correctness of a trial court's ruling on a pretrial motion to suppress, appellate courts may consider the proof adduced both at the suppression hearing and at trial." State v. Henning, 975 S.W.2d 290, 299 (Tenn. 1998).

The Fourth Amendment to the United States Constitution and article I, section 7 of

the Tennessee Constitution protect citizens against "unreasonable searches and seizures." In general, warrantless searches and seizures are presumptively unreasonable and any evidence obtained as a result of the warrantless action is subject to suppression. State v. Richards, 286 S.W.3d 873, 878 (Tenn. 2009). However, if the State "demonstrates by a preponderance of the evidence that the search or seizure was conducted pursuant to an exception to the warrant requirement," the evidence will not be suppressed. State v. Keith, 978 S.W.2d 861, 865 (Tenn. 1998). Our courts have thus articulated three categories of police-citizen interaction and their corresponding evidentiary requirements: "(1) full-scale arrest, which must be supported by probable cause; (2) brief investigatory detention, which must be supported by reasonable suspicion of criminal activity; and (3) brief police-citizen encounter that requires no objective justification." State v. Hanning, 296 S.W.3d 44, 48 (Tenn. 2009) (citations omitted); see also State v. Nicholson, 188 S.W.3d 649, 656 (Tenn. 2006).

A seizure or detention occurs when "'in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.'" State State v. Williams, 185 S.W.3d 311, 316 (Tenn. 2006) (quoting United States v. Mendenhall, 446 U.S. 544, 554 (1980)). However, an arrest

> is more specifically defined as the "taking, seizing, or detaining of the person of another, either by touching or putting hands on him, or by any act which indicates an intention to take him into custody and subjects the person arrested to the actual control and will of the person making the arrest." An arrest may be affected without formal words or a station house booking. However, there must be actual restraint on the arrestee's freedom of movement under legal authority of the arresting officer.

State v. Crutcher, 989 S.W.2d 295, 301-02 (Tenn. 1999) (citations omitted). Handcuffing and placing a person in the back of a patrol car does not automatically transform a brief detention for investigative purposes into an arrest. See State v. Marvin Roscoe, No. W2013-01714-CCA-R9-CD, 2014 Tenn. Crim. App. LEXIS 687, at *12 (Jackson, July 11, 2014).

In this case, Officer Condon knew that a robbery involving a weapon had just been committed, that Galmore's physical description and clothing matched that of the robber, that the appellant and Galmore were in the Citgo parking lot together, and that they were in close proximity to the scene of the robbery and the stolen phone behind Zaxby's. Based on those circumstances, we agree with the trial court that the officers had reasonable suspicion to detain Galmore and the appellant for further investigation.

-8-

However, a detention must not last longer than needed to effectuate the reason underlying the stop, with the officer "'diligently pursu[ing] a means of investigation that [is] likely to confirm or dispel their suspicions quickly.'" Id. (quoting State v. Simpson, 968 S.W.2d 776, 783 (Tenn. 1998)). Here, Officer Condon placed Galmore and the appellant into the back of the patrol cars and waited for other officers to arrive. Officer Staten testified that he arrived at the scene while the appellant was in the patrol car and that he spoke with the store clerk, who told him that the appellant and Galmore had switched clothes in the store's bathroom. Officer Condon testified that about fifteen minutes after he put Galmore into his patrol car, he spoke with Galmore and also learned that Galmore and the appellant had switched clothes. We agree with the trial court that fifteen minutes was a reasonable time for the officers to detain Galmore and the appellant in order to investigate the circumstances of the robbery. Therefore, that the court properly denied the appellant's motion to suppress.

### III. Conclusion

Based upon the record and the parties' briefs, we affirm the judgments of the trial court.

_____
NORMA MCGEE OGLE, JUDGE