# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
September 28, 2010 Session

## STATE OF TENNESSEE v. CLIFFORD EDWARD CLARK, ALIAS

**Direct Appeal from the Criminal Court for Knox County**
**No. 90252      Mary Beth Leibowitz, Judge**

---

**No. E2009-01795-CCA-R3-CD - Filed October 24, 2011**

---

Defendant-Appellee, Clifford Edward Clark, was indicted by the Knox County Grand Jury for vandalism of property valued at $1,000 or more but less than $10,000, a Class D felony, and reckless endangerment committed with a deadly weapon, a Class E felony.  Clark filed several motions to suppress evidence and dismiss the indictment because of lost or destroyed evidence pursuant to State v. Ferguson, 2 S.W.3d 912 (Tenn. 1999), which were denied. Clark then filed a motion to reconsider, which the trial court took under advisement.  The trial court subsequently dismissed the indictment and suppressed certain evidence pursuant to both Ferguson and Arizona v. Gant, 129 S. Ct. 1710 (2009).  In this appeal by the State, it argues that the trial court abused its discretion in dismissing the indictment and erred in granting Clark's motions to suppress based on its holdings that:  (1) the search of Clark's vehicle violated Gant, and (2) the State's loss or destruction of certain evidence violated Ferguson.  Upon review, we reverse the trial court's judgment, reinstate Clark's indictment, suppress the photographic evidence of the camera housing, and remand for trial.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court**
**Reversed and Remanded**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and NORMA MCGEE OGLE, JJ., joined.

Robert E. Cooper, Jr., Attorney General and Reporter; John H. Bledsoe, Senior Counsel; Randall Eugene Nichols, District Attorney General; and Zane M. Scarlett, Assistant District Attorney General, for the Appellant, State of Tennessee.

Ronald C. Newcomb, Knoxville, Tennessee for the Defendant-Appellee, Clifford Edward Clark, Alias.

## OPINION

# FACTUAL BACKGROUND

On November 25, 2007, Clark was stopped by officers as he was leaving the parking lot of a closed business where the officers had just heard four shots fired. During a Terry[1] pat-down search, an officer discovered two rifle scope lens covers. At the same time, a second officer observed a rifle case partially covered by a windshield sun shade behind Clark's seat. Inside the rifle case was a Ruger rifle and a box of rifle rounds with four bullets missing. Immediately thereafter, the officers discovered that a nearby red light traffic camera had been shot four times.

**Arrest Report.** Officer James Cox of the Knoxville Police Department provided the following written report regarding this case:

On [November 25, 2007,] at 1:45 a.m., I[,] Officer Cox 1811, Officer J. Keck 1617[,] and Officer W. Bingham 1833 were stopped near the [i]ntersection [of] Broadway and I-640. We heard what sounded like two very loud gun shots [sic]. We began to circulate the area when a [third] shot sounded out. I stopped on Broadway about 100 feet from the [r]ed light camera on Broadway and I-640 when I heard the fourth shot. I could tell it was coming from a closed business on Greenway Dr[.] at Broadway[,] (Pittman Auto)[.] We began to drive around the building when a silver [Chrysler] minivan Texas Tag # 948wgc c[a]me out from behind the business at a high rate of speed. I initiated a traffic stop[,] and the vehicle stopped on Greenway Dr[.] at Broadway. The suspect (Clifford [Edward] Clark []) tried to exit the vehicle when he stopped. I ordered him to stay still and show me both his hands. I had him step out of the vehicle and place both hand[s] on the side of the van. I began to do a [T]erry pat[-down] when I felt two round objects in his right coat pocket. I asked him what they were and he stated he did not know and to take them out and look. I reached in a[nd] pulled out two scope lens covers. I detained him and asked him where the [rifle] was he had been shooting. He stated he had no [rifle] and a friend put [the lens covers] in his pocket. He was very nervous and [was] being very vague. Officer Keck looked inside his van and could see a [rifle] bag. In the bag was the Ruger [rifle] with scope. I read him his [Miranda] rights and asked him what was he shooting at [sic]. He told me he could not say because it would get him in trouble. Officer Bingham found [three] shell casing[s] in the parking lot where [Clark] came from [sic]. He [then] noticed that the [r]ed light camera had been shot [four] times, with [one] round [traveling] completely through [the camera]. In the [rifle] bag was

---

[1] See Terry v. Ohio, 392 U.S. 1 (1968).

a box of [rifle] rounds. The box held [twenty] rounds but only sixteen were in the box[, and] four were missing. I check[ed] the [rifle] and found [one] spent shell casing in the barrel. [Clark] made a statement that he was upset about getting a ticket from the red light camera[]. [Clark] was arrested for felony [v]andalism and [r]eckless [e]ndangerment. He was city cited for discharging a firearm in the city limits.

**Preliminary Hearing.** At the February 7, 2008 preliminary hearing, Clark informed the trial court that he would be proceeding pro se.

Officer James Cox of the Knoxville Police Department testified that at approximately 2:00 a.m. on November 25, 2007, he, Officer Keck and another officer were sitting in a parking lot completing paperwork when they heard a sound that resembled either a gunshot or a truck backfiring. Approximately a minute later, they heard a second sound that they confirmed was a gunshot, and the officers left the parking lot. Officer Cox stated that he and the other officers split up and drove in different directions. As he was en route, Officer Cox heard a third gunshot. At this point, Officer Cox stated that he could tell that the shots were being fired from a "high-powered large caliber gun or rifle." Officer Cox stated that he drove to an area approximately 100 feet from the red light traffic camera at Broadway and the I-640 ramp. He explained that the red light traffic camera's function was "to catch people who violate the red light law by running the red light there going southbound on Broadway." When he arrived at the location of the camera, he rolled down his windows to see if he could hear any more shots. He then heard a fourth gunshot and could tell that it came from a parking lot behind Pittman Automotive, a repair shop. He drove toward the lot behind Pittman Automotive, and as he approached the closed business, he saw a minivan pull out of the parking lot and turn left, passing him on Greenway Drive. He first saw this minivan approximately one minute after he heard the fourth gunshot. He notified the other officers that this vehicle had left the area where the gunshots originated. Officer Cox turned around and "initiated a traffic stop[.]" The minivan stopped on Greenway Drive, just short of Broadway. Officer Cox stated that he saw no other vehicles near Pittman Automotive at the time that he heard the gunshots.

Officer Cox identified Clark as the driver of the minivan that he stopped on November 25, 2007. He stated that he cautiously approached Clark: "I was not sure what the exact weapon we were looking for was [sic]. He [might or might not] have it on his person . . . . And so I . . . approached him[] and started to talk to him through the window." Officer Cox said that the other officers quickly arrived at the location of the traffic stop. He then described his interaction with Clark:

I told [Clark,] the driver of the vehicle – I advised him to step out, told him I was going to check for weapons. I patted him down. I felt two cylindrical

objects in his right coat pocket. I asked him what they were. He told me he didn't know but to check and see. I reached in there and pulled [the objects] out, and immediately recognized them as being two amber lens covers for a scope of a rifle.

Officer Cox described the next series of events:

I asked [Clark] where the rifle was that belonged to the scope . . . and he said he didn't have the rifle. I asked him a couple of times and he said he didn't have one. I asked him why did he have scope covers in his pocket and he told me that he let somebody borrow his jacket and . . . they must have put [the lens covers] in there.

Officer Cox said that Officer Keck was standing nearby to ensure his safety during his interactions with Clark. Officer Cox also said that a weapon was later retrieved from the minivan. He stated that he was present when Officer Keck read Clark his Miranda rights. Following the reading of his rights, Officer Cox asked Clark some questions:

I just flat out asked him what he was shooting at [sic]. I said were you shooting at us, were you shooting at the cars on the interstate, the cars on Broadway, . . . or were you shooting at the [red light traffic] camera. It crossed my mind that the camera was sitting there. He said no.

Officer Cox then asked Clark if he had gotten a ticket from the traffic camera, and Clark said that he did not know, but "he might have." Clark then asked for an attorney and apologized for "causing a situation." At that point, Officer Cox took him into custody. Shortly thereafter, Officer Cox looked at the traffic camera and observed that it had four entry holes and one exit hole. He was not able to look at the inside of the camera. He also opened the rifle case:

[In the case] was [a] rifle, and a box of shells. I opened up the box of shells and found four empty slots . . . . I got on the radio and told my partner to go down to [the parking lot] where [Clark had come from] to make sure he wasn't shooting at somebody. We never found anybody, but we did recover three shell casings. [I] picked the rifle up, ejected the bolt, and the fourth empty shell casing came out.

Officer Cox confirmed that Clark was the only individual inside the minivan.

On cross-examination, Officer Cox acknowledged that the rifle case was under a large windshield sun shade. He clarified that he was not the officer that found the rifle case.

-4-

Officer Jason Keck of the Knoxville Police Department testified that he was sitting at the 640 Building just west of Broadway when he heard "a loud popping noise." He said that Officer Cox was sitting in his car next to him at the time, and he told Officer Cox that the noise was a gunshot. When they heard a second gunshot, Officer Keck "pulled south of Pittman Automotive, which is located on Broadway and Greenway" facing north. He said Officer Cox drove closer to Pittman Automotive when they both heard a third gunshot. Officer Keck said Officer Cox "got on the radio and said that he thought [the shots were] coming from behind Pittman Automotive." Officer Cox then drove northbound on Greenway Drive, where he located a silver minivan. As Officer Cox initiated the traffic stop, Officer Keck said he went with him for back-up because there was a "potential for danger" since they had just heard shots. Clark was heading westbound on Greenway Drive near Broadway at the point that he stopped his vehicle. Officer Keck confirmed that neither he nor Officer Cox knew the target of Clark's gunshots. He also identified Clark as the individual who was driving the minivan. Officers Cox and Keck approached the minivan. Officer Keck described what happened next:

> Officer Cox got Clark out of the van, asked him to step out, I suppose. [Clark] stepped out of the vehicle . . . . He then put his hands against the van, if I remember correctly, and Officer Cox started to pat him down. And when he was patting him down, he felt something apparently in his pocket, because Officer Cox, when he got to that right pocket of his jacket, he asked him what was in there. And Mr. Clark said something [like] I don't know. . . .
>
> . . . [Clark said] look in there and find out, something to that effect. Officer Cox reached in his pocket and pulled out two lens covers for a scope.

Officer Keck stated that when Officer Cox safely secured Clark, he began looking inside the minivan:

> I glanced into the vehicle. I saw a solar-type shade you use in the front of a windshield . . . . Underneath it I could see a nylon case that looked like a gun case to me. And so I got the case out of the van. I stepped over to one of the [patrol] cars, I believe, and unzipped it. It had a Ruger Model 77. [It was] stainless and . . . it had a scope on it. It was a 30.06.

Officer Keck said that in order for Clark to access the rifle, "[h]e would have to reach over behind his driver's seat [and] unzip the case[.]" Officer Keck later located three shell casings in the back of Pittman Automotive. He said that in order to shoot the traffic camera from the rear of Pittman Automotive, the bullet would have to pass across Broadway, and if it hit the camera and passed through it, the bullet would continue toward I-640. He added that the rifle

-5-

found in Clark's vehicle was an "extremely high powered" weapon. He said that the rifle in the case appeared to match the lens scope covers that Officer Cox had discovered in Clark's pocket. Officer Keck informed Officer Cox that he had found the rifle but did not handle the weapon itself. Officer Keck then went back to the police car where Clark was located and read his Miranda rights to him. Clark told Officer Keck that he did not want to talk to him because he did not want to get in trouble. Clark then asked to speak with an attorney.[2] Officer Keck said that photographs were taken of the shell casings, and the forensics lab was told of the incident. He said that he viewed the traffic camera that night and observed four entry holes and one exit hole.

On cross examination, Officer Keck acknowledged that the windshield sun shade was larger than the rifle case it covered. He also admitted that he did not actually see Clark shooting at the traffic camera. He added that no traffic citations were issued to Clark the night of the incident. On re-direct examination, Officer Keck clarified that the sun shade did not completely cover the rifle case.

Anthony Boreno, an employee of Redflex Traffic Systems, testified that his company contracted with the Knoxville Police Department "to provide photographic evidence for the automated enforcement program." He stated that the owner of the traffic cameras was Redflex Traffic Systems, who maintained and operated the cameras and provided the evidence to the police department. He stated that the company had a technician in eastern Tennessee who repaired any damaged cameras. Boreno said that his company was notified that a traffic camera at I-640 and Broadway was damaged shortly after the incident on November 25, 2007. He stated that the value of the camera in this case was $90,462, and the repairs to the camera were approximately $17,000.

Clark requested that the video recording of his traffic stop be entered into evidence. The court reviewed the recording, which did not have audio, with the State and Clark. The court stated that it could not see any tampering with the evidence but noted that the images on the recording were blurry. The court also stated that it saw an officer pull the rifle out, go off screen, and then come back with the bolt back. After viewing the recording, the court held that it did not see any proof that the officers tampered with the evidence in this case.

At the conclusion of the preliminary hearing, the trial court determined that there was probable cause that Clark committed the offenses in this case. Clark was subsequently indicted for vandalism of property valued at $1,000 or more but less than $10,000 and reckless endangerment committed with a deadly weapon.

_____

[2]Although the State questioned Officer Keck about whether he asked Clark additional questions after Clark informed him that he wanted to speak with an attorney, the preliminary hearing transcript indicates only that Officer Keck's response to that question was "inaudible."

**Motions.** Clark was represented by counsel at his arraignment on November 20, 2008. On February 4, 2009, Clark filed a motion to dismiss or, in the alternative, motion to suppress based on the State's failure to timely and completely file discovery materials. In this motion, Clark complained that the State's discovery responses had been received nearly a month late and that the responses indicated that the red light traffic camera at issue in this case had been repaired and reused before he had the opportunity to inspect it in violation of Ferguson. On February 29, 2009, the trial court heard Clark's motion to dismiss or, in the alternative, motion to suppress and took it under advisement. On March 10, 2009, the trial court in Division I transferred the case to Division III.

On March 24, 2009, Clark's attorney filed a motion to withdraw, claiming that Clark had expressed his desire to terminate the attorney-client relationship. On March 26, 2009, Clark filed a pro se motion for dismissal pursuant to Ferguson, despite the fact that counsel had not been allowed to withdraw. In this motion, Clark argued for a dismissal of all of his charges because the metal case surrounding the traffic camera and the bullets alleged to have hit the traffic camera were missing. He argued, citing Ferguson, 2 S.W.3d at 917-18, that the aforementioned evidence had "been altered or destroyed to the degree that forcing [him] to trial would be fundamentally unfair as it deprives him [of] the right to obtain exculpatory evidence[.]" On April 22, 2009, Clark's counsel filed a supplemental motion to dismiss alleging the same arguments that Clark made in his pro se motion to dismiss.

On April 30, 2009, the trial court entered a written order denying Clark's motions to suppress and/or dismiss. The trial court summarized the evidence from the preliminary hearing before ruling that it was denying Clark's motion:

> The officers testified[] and stated that they were on patrol in the area of Broadway and I-640 when they heard shots fired. The[y] testified that they immediately began looking for the area from which the shots came. They were sure they were hearing gun fire. After hearing the third shot they stopped in an area they believed to be near where the shots came from and heard a fourth shot. They identified a closed place of business (it being 1:45 a.m.) from whence a silver Chrysler Minivan with a Texas Tag No. 948WGC, came from around a building at a high rate of speed. Not knowing where the shots had been directed or whether they had been directed at an individual, themselves, or an object, they initia[t]ed a traffic stop, [and] the vehicle was stopped at the corner of Greenway Drive and Broadway. When the defendant tried to exit the vehicle he was told to show his hands[,] and he was patted[-]down for [the] officers['] safety. During the course of the "Terry" pat[-]down, the officer found two objects and asked what they were. The suspect answered that he did not know and to go ahead and look. The officer pulled out two rifle scope covers. The suspect appeared nervous and denied that he knew where the

covers had come from [sic]. The suspect denied having a rifle, but the officers then saw in plain sight a rifle bag found under a windshield shade. The [o]fficers then administered the defendant's rights to him[,] and he continued to make statements. The officers then noticed that the red light camera had been shot . . . four separate times and discovered upon search of the vehicle a Ruger rifle with a scope and a bullet box. A spent shell casing was [found in] the rifle[,] and the suspect made incriminating statements after being <u>Mirandized</u> [sic]. He was then arrested.

Mr. Clark claims that he was stopped without cause, and that he had gone around the side of the building to urinate[] and that he was not administered his rights. The defendant in his motion also claims that he asked for a lawyer. The "Terry" pat was clearly appropriate for the officers['] safety in light of the fact that there were investigating a possible felony, were trying to determine whether or not they were being shot at [sic], or anyone else was being shot. The suspicion that the officers had at seeing the vehicle coming out from the area where they located the sounds of gun shots, at 1:45 a.m., and the subsequent stop, was totally appropriate. The officers testified credib[ly] about the objects they saw in the vehicle, and the behavior of Mr. Clark, the defendant. There may be inconsistencies between the statements that the officers have made, or statements in the warrant, but these inconsistencies go more probably to the weight of the evidence for a jury. [The officers] had articulable and reasonable suspicion to stop. The officers also testified credibly that the [<u>Miranda</u>] rights were administered upon the "Terry" pat[-] down occurring, and the scope covers being found as well as the rifle bag containing the rifle. Additionally, even after requesting a lawyer, according to the officers['] statements, Mr. Clark continued to make somewhat incriminating statements. Thus[,] the motions to suppress evidence are hereby respectfully denied.

On May 1, 2009, the trial court in Division III noted that counsel had withdrawn his motion to withdraw.

On May 27, 2009, Clark filed a motion to reconsider the trial court's denial of his motions to suppress evidence and dismiss the indictment. In it, Clark argued:

This Honorable Court issued a written ruling concerning previous motions in this matter on April 30, 2009. One of the principal facts relied upon by this Honorable Court in the Order was the fact that the basis for the search [of his vehicle occurred] when . . . Officer Cox subjected Mr. Clark to a safety pat[-]down and found some alleged scope covers on his person. Mr.

Clark would point out to this Honorable Court that pursuant to the discovery filed in the case by the State of Tennessee through the Assistant District Attorney . . . on January 26, 2009, no such lens covers exist in the section of the discovery that details documents and tangible objects. As such, Mr. Clark avers that since these lens covers were not properly maintained in evidence and [were not] properly produced for inspection in the discovery process, they should not be a basis for this Honorable Court to overrule the Defendant's Motion to Suppress and/or Dismissal [of] the Indictment.

Clark also argued his charges should be dismissed because the traffic camera housing, which he claimed was in the custody and control of the Knoxville Police Department, was no longer available "for independent testing that would have an impact with regard to line of sight and other physical and geometrical analysis of the alleged crime scene." On July 1, 2009, the trial court took Clark's motions for dismissal under advisement. On July 29, 2009, Clark filed a motion to suppress, or in the alternative, continue the trial. In this motion, Clark argued that the official firearms report should be suppressed because the report stated that three bullets were inside the red light traffic camera but were not identified in the report and were not produced in discovery. In addition, Clark requested the trial court to suppress the report or continue his trial to give Clark the opportunity to depose the State's ballistic expert and allow him time to retain his own ballistics expert.

On July 30, 2009, the trial court issued a written order on Clark's motion to reconsider suppression and dismissal based on Ferguson and Gant. The order stated:

In this case the defendant, by and through counsel, has moved to reconsider the dismissal based upon the constitutional standards arising from State v. Ferguson, 2 S.W.3d 917 (Tenn. Crim. App. 1999) regarding missing evidence and Arizona v. Gant, [129 S. Ct. 1710 (2009),] regarding [the] search of vehicles.

This court has issued a written ruling considering the previous motions [which was entered on] April 30, 2009. This court's opinion was based upon the pat-down for officer's safety and the alleged location of scope covers which caused the officers to be concerned regarding the shooting incident which they were investigating. Subsequent, thereto, the court has received [the] benefit of the case of Arizona v. Gant and the video tape of the stop and arrest of Mr. Clark.

For the following reasons the court reverses its decision with respect to the motion to suppress the evidence and dismiss.

It is clear from the credible testimony, of the officers, that they heard shots fired and sought to determine where the shots were coming from. They determined that the shots were coming from the back of a closed business, and proceeded in that direction. They observed a vehicle proceeding at a relatively high speed coming out from the private road connecting to that building and made a U-turn and proceeded to stop the vehicle within a short distance. The officers removed the defendant, Mr. Clifford Clark, from the vehicle almost immediately and on the video tape which has no audio available, patted-down and handcuffed the defendant within a few seconds.

It is admitted by the state that the lens covers were not made a part of the body of evidence which is discoverable in this case. The officers testified that they took the defendant into custody and in plain view in the back of the vehicle [was] a rifle case sticking out from under a windshield shade. The video tape demonstrates that officers took the defendant into custody, took him back to the rear of the camera. One officer went forward to the defendant's vehicle and with a flashlight, it being the early hours of the morning, looked into the rear of the vehicle pulling out a rifle case which he laid on the hood of the vehicle. He proceeded to open it and examine the rifle, open the other side of the vehicle and obtain other items that were within the vehicle and place them on the hood of the vehicle. Afterward[,] another officer came and picked the rifle up and examined the rifle, put it back into the case, counted out cartridges, and packed them together and carried away the rifle. At all times the defendant was nowhere near his vehicle, or the rifle. It is also conceded that the officers immediately took action to search the vehicle without the benefit of any search warrant, nor was there any written consent to search. The defendant denies giving any oral consent to search.

Additionally, and pursuant to the motion to reconsider[,] the court requested that the state search for the camera cover and enclosure which the defendant is alleged to have shot in order that there be an opportunity for requested testing. [The] state was unable to produce the evidence and the Attorney General after inquiring has determined that some of the evidence is gone, and that some of the evidence has apparently been recycled for use. Thus[,] the defense contends that it cannot examine these items which were damaged, nor do ballistics testing. It is the court[']s opinion that the search of the vehicle[,] in the absence of a search warrant and after the defendant had been safely removed from access to the vehicle[,] in the rear of the car in the dark with a flashlight violates the United States Supreme Court [c]ase Arizona v. Gant in which the court held that Chimel v. California, 395 U.S. 752, requiring that a search incident to arrest be justified by either the interest in

officer safety or the interest in preserving evidence applied[] and that the defendant in Gant[,] who neither posed any danger to officer safety nor was able to access the passenger compartment to harm or destroy evidence, invalidated a warrantless search of the motor vehicle. Additionally, State v. Ferguson, 2 S.W.3d 912 (Tenn. Crim. App. 1999)[,] holds that the constitution is violated when missing evidence has not been produced and is crucial to the opportunity of the defense to discover and examine such missing evidence. Thus[,] it is this court's opinion that while no officer violated the law that he knew at that time, these two incidents combined together require that the evidence taken from the motor vehicle would be suppressed and the case should therefore be dismissed.

On August 4, 2009, the State filed a motion to reconsider the court's July 30, 2009 order, wherein it requested that "it be allowed to present proof in this case to clarify the [evidence] in light of the Gant decision."[3] The State then filed its notice of appeal on August 27, 2009.[4]

## ANALYSIS

The State contends that the trial court abused its discretion in dismissing Clark's indictment in light of Gant and Ferguson. "The decision whether to dismiss an indictment lies within the discretion of the trial court." State v. Harris, 33 S.W.3d 767, 769 (Tenn. 2000) (citing State v. Benn, 713 S.W.2d 308, 311 (Tenn. 1986)). Consequently, "[a]ppellate courts 'may not interfere with a ruling made within the discretionary powers of the trial court absent clear abuse.'" Id. at 769-70 (quoting State v. Street, 768 S.W.2d 703, 709 (Tenn. Crim. App. 1988)).

The State also argues that the trial court erred in suppressing evidence taken from Clark's vehicle. "[A] trial court's findings of fact in a suppression hearing will be upheld

---

[3]There is no order denying the State's motion to reconsider in the record.

[4]On April 29, 2010, Clark filed a "Motion for Forensic Competency Evaluation and Hearing Regarding Indigency for Costs of Forensic Competency Evaluation" in this court. On May 12, 2010, this court filed an order deferring its ruling on this motion and requiring the State to file a response addressing whether there is a "constitutional or statutory requirement that a criminal defendant be competent to proceed on appeal when represented by counsel and, if so, what the proper standard is for determining whether a criminal defendant is competent to proceed with an appeal when represented by counsel." The State filed a response on June 14, 2010. On August 13, 2010, this court entered an order denying the motion for a forensic competency evaluation at the appellate level and concluding that a "non-capital defendant's mental incompetence to assist his attorney in pursuing an appeal should not prohibit the appeal from continuing."

unless the evidence preponderates otherwise." State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). However, we must review a trial court's application of the law to the facts under a de novo standard of review. State v. Nicholson, 188 S.W.3d 649, 656 (Tenn. 2006); State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001). "The party prevailing in the trial court is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence." Odom, 928 S.W.2d at 23.

## I. **Warrantless Search.**

The State contends that the trial court abused its discretion in dismissing Clark's indictment based on "perceived violations" of Arizona v. Gant, 129 S. Ct. 1710 (2009), and State v. Ferguson, 2 S.W.3d 912 (Tenn. 1999). Interestingly, the State on appeal does not argue that the rifle case recovered from Clark's vehicle was in "plain view." See Washington v. Chrisman, 455 U.S. 5, 5-6 (1982). Instead, the State argues that the search conducted after Clark was arrested, which resulted in the recovery of the rifle, a spent casing in the rifle, and a box of rounds, was compliant with Gant because it was "reasonable to believe that evidence of the offense of arrest might be found in the vehicle." Gant, 129 S. Ct. at 1714. The State further contends that because the trial court failed to consider this qualification to the holding in Gant, it improperly held that Gant precluded admission of any evidence found in Clark's vehicle.

In response, Clark argues that the trial court properly applied Gant to the facts of his case before suppressing "the evidence of the illegal stop, search[,] and seizure[Clark's brief, 9]" and dismissing his indictment. Specifically, he asserts that he was handcuffed and a good distance away from his vehicle at the time that one of the officers discovered the rifle in his vehicle after "rummaging around with a flashlight." He claims that the warrantless search of his vehicle was not justified by officer safety or the need to preserve evidence since at the time of the search he had been restrained by handcuffs and removed from the area. He also argues that the State misinterpreted the qualification in Gant.

In addition, Clark claims that the officers stopped him pursuant to a traffic stop rather than a felony stop. He asserts that because the crime of arrest was a traffic violation, the officers were precluded from searching his vehicle without a warrant. Moreover, he claims that "[u]nder Gant . . . , the crime of arrest must be defined prior to search, and that crime has to be a traffic violation because Officer Cox noted a traffic stop based on excessive speed in his report." Clark also contends that his mere presence in the area was not sufficient to justify the stop. Finally, Clark argues that since the lens covers were lost and the video does not show their recovery, the lens covers cannot provide justification for the further search of his vehicle.

Here, it is clear that Clark was properly stopped pursuant to Terry v. Ohio, 392 U.S. 1 (1968). Under Terry, an officer may stop an individual if the officer has a reasonable suspicion that the person is currently engaging or has engaged in illegal activity. Id. at 30. "Reasonable suspicion is a particularized and objective basis for suspecting the subject of a stop of criminal activity, and it is determined by considering the totality of the circumstances surrounding the stop[.]" State v. Binette, 33 S.W.3d 215, 218 (Tenn. 2000) (internal citations omitted). In order to justify a stop pursuant to Terry, "the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." Terry, 392 U.S. at 21. Moreover, these facts must be "judged against an objective standard"; that is, would a reasonable person find the officer's actions appropriate in light of the facts known to the officer at the time of the search or seizure? Id. at 21-22. In this case, Clark was arrested because the officers suspected him of firing four gunshots from the parking lot of a closed automotive repair shop. One minute after hearing the last of four gunshots, Officer Cox saw Clark drive away at a high rate of speed from the area behind the automotive shop. Given these facts, we conclude that Clark's stop was proper under Terry.

In addition, despite the trial court's holding that the search of Clark's vehicle unreasonable under the Fourth Amendment, we conclude that the warrantless search, which resulted in the discovery of the rifle, a spent casing in the rifle, and a box of shells, was proper based on two alternative theories: (1) the rifle case was in "plain view" at the time of Clark's detainment and arrest, or (2) the qualification in Gant applied to the search incident to Clark's arrest because it was reasonable for the officers to believe that evidence related to the crime of arrest was present in the vehicle. "[U]nder both the federal and state constitutions, a warrantless search or seizure is presumed unreasonable, and evidence discovered as a result thereof is subject to suppression unless the State demonstrates that the search or seizure was conducted pursuant to one of the narrowly defined exceptions to the warrant requirement." State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997) (citing Coolidge v. New Hampshire, 403 U.S. 443, 454-55 (1971); State v. Bartram, 925 S.W.2d 227, 229-30 (Tenn. 1996)). In McMahan, this court outlined the exceptions to the warrant requirement:

> A warrantless search is per se unreasonable, unless it falls into one of the narrowly defined and carefully drawn exceptions to the warrant requirement, i.e., searches incident to a lawful arrest, those made by consent, in the "hot pursuit" of a fleeing criminal, "stop and frisk" searches, and those based on probable cause in the presence of exigent circumstances.

State v. McMahan, 650 S.W.2d 383, 386 (Tenn. Crim. App. 1983) (citing State v. Shaw, 603 S.W.2d 741, 742 (Tenn. Crim. App. 1980)). In addition, "[t]he 'plain view' exception to the Fourth Amendment warrant requirement permits a law enforcement officer to seize what clearly is incriminating evidence or contraband when it is discovered in a place where the

officer has a right to be." Chrisman, 455 U.S. at 5-6 (citing Coolidge, 403 U.S. at 466; Harris v. United States, 390 U.S. 234, 236 (1968)). The requirements for a seizure of items in "plain view" are the following: (1) the evidence must be in plain view; (2) the officer must not have violated the Fourth Amendment in order to arrive at the location where the evidence can be plainly viewed; and (3) the incriminating nature of the object must be apparent based on the viewing. Horton v. California, 496 U.S. 128, 136-37 (1990) (citations and footnote omitted).

At the July 1, 2009 hearing on the motion for reconsideration, the prosecutor argued that while the first officer was conducting the Terry pat-down in which the scope lens covers were found, the second officer had "arrived and was looking in the back of the vehicle Mr. Clark was driving and saw the [rifle case] sticking out from underneath the windshield cover." He further argued that the discovery of the lens covers was not the basis of the search which uncovered the rifle in Clark's vehicle. The prosecutor added that the discovery of the lens covers was the basis for the arrest, and that while the arrest was happening, the second officer looked in the back of Clark's vehicle and saw the rifle case in plain view. In response, the defense argued that the absence of the scope lens covers meant that there was no justification for the further search of Clark's vehicle.

The video recording of Clark's stop shows that in addition to Officer Cox's patrol car headlights and light-bar illumination, there were also two streetlights in the immediate area of Clark's car. Moreover, Clark opened his car door when stopped, and this door was open for the duration of his stop and arrest. Both Officer Cox and Officer Keck were present while Clark was questioned beside his vehicle. Officer Keck testified at the preliminary hearing that he saw the rifle case in plain view at the time that Clark was being arrested. Because of the potential threat from Clark, Officer Keck waited until Clark was in handcuffs and headed to the patrol car before he retrieved the rifle from Clark's vehicle. Immediately after Clark was led away, Officer Keck retrieved the rifle case from the vehicle. We conclude that all of these facts, when viewed together, show that the rifle case was in "plain view" at the time of Clark's detainment and arrest. Accordingly, the seizure of the rifle case, rifle, box of shells, and spent shell casing were proper under the "plain view" doctrine.

Additionally, the plain viewing of the rifle case provided a justification for the search of the vehicle pursuant to Gant. On April 21, 2009, the United States Supreme Court decided Gant, in which it held the following:

> Police may search a vehicle incident to a recent occupant's arrest only if the arrestee is within reaching distance of the passenger compartment at the time of the search or it is reasonable to believe the vehicle contains evidence of the offense of arrest. When these justifications are absent, a search of an

-14-

arrestee's vehicle will be unreasonable unless police obtain a warrant or show that another exception to the warrant requirement applies.

129 S. Ct. at 1723-24. In reaching this holding, the Court concluded that <u>New York v. Belton</u>, 453 U.S. 454 (1981), "does not authorize a vehicle search incident to a recent occupant's arrest after the arrestee has been secured and cannot access the interior of the vehicle." <u>Gant</u>, 129 S. Ct. at 1714. Instead, the Court concluded, pursuant to <u>Chimel</u>, that police may "search a vehicle incident to a recent occupant's arrest only when the arrestee is unsecured and within reaching distance of the passenger compartment at the time of the search." <u>Id.</u> at 1719. However, the Court noted an exception to this rule, holding that "circumstances unique to the vehicle context justify a search incident to a lawful arrest when it is 'reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle.'" <u>Id.</u> (quoting <u>Thornton v. United States</u>, 541 U.S. 615, 632 (2004) (Scalia, J., concurring)). The court noted that in cases where there is an arrest for a traffic violation, law enforcement will have "no reasonable basis to believe the vehicle contains relevant evidence." <u>Id.</u> (citing <u>Atwater v. Lago Vista</u>, 532 U.S. 318, 324 (2001); <u>Knowles v. Iowa</u>, 525 U.S. 113, 118 (1998)). However, in other cases, "including <u>Belton</u> and <u>Thornton</u>, the offense of arrest will supply a basis for searching the passenger compartment of an arrestee's vehicle and any containers therein." <u>Id.</u>

We agree with the State's assertion that the exception noted in <u>Gant</u> applies in this case because it was reasonable for Officers Cox and Keck to believe at the time of the search that evidence related to the crime of arrest might be found in Clark's vehicle. At the time that the officers stopped Clark, they were looking for an individual responsible for firing several gunshots from an area behind a closed automobile repair shop. One minute after hearing the last gunshot, Officer Cox saw Clark leaving the parking lot behind the auto repair business. After stopping Clark's vehicle, Officer Cox conducted a <u>Terry</u> pat-down and discovered two scope lens covers in Clark's coat pocket. As Officer Cox arrested Clark and put him in the back of a patrol car, Officer Keck saw a rifle case located under a windshield sun shade in the backseat of Clark's vehicle and immediately retrieved it. He opened the case and found a high-powered rifle with a scope as well as a box of shells, with four shells missing. A spent shell casing was subsequently found in the rifle. We conclude that both the search of Clark's vehicle and the seizure of the rifle, rifle case, box of shells, and the spent shell casing inside the rifle was proper pursuant to <u>Gant</u>.

## II. Lost or Destroyed Evidence.

The State also contends that Clark failed to show that his indictment must be dismissed pursuant to <u>Ferguson</u> because of the loss or destruction of the damaged red light traffic camera, the camera housing, and the rifle scope lens covers. The State asserts that it had no duty to preserve the camera and its exterior housing because all parts of the camera

-15-

were owned by a private company known as Redflex Traffic Systems. The State further contends that the damaged camera and its housing were not apparently exculpatory. In response to Clark's claim that the destruction of the camera and its housing prevented him from determining the trajectory of the bullets, the State argues that Clark's "rationale would apparently require the City of Knoxville and Redflex Traffic Systems to leave the damaged camera in place and inoperable for an open-ended length of time solely based upon the defendant's otherwise weak assertion of exculpatory evidence." Moreover, the State asserts that it retained photographs of the damaged camera and housing, which are comparable evidence.

In response, Clark argues that the trial court was justified in dismissing his indictment based on the loss or destruction of the red light traffic camera and its housing which constituted a severe violation of Ferguson. Interestingly, he equates the loss of the camera housing to the loss of a body in a homicide case. Clark asserts that the State had control of the camera and its housing, was aware that it was an important piece of evidence with exculpatory value, and had a duty to retain this evidence. Moreover, because of the loss of this evidence, Clark asserts that he was unable to conduct testing on this evidence that would have been vital to his defense. He also argues that the photographs the State took of the camera are not an adequate substitute for the actual camera and housing because only the physical evidence can be tested. In addition, Clark contends that the loss of the alleged scope lens covers was detrimental to his defense because they provided justification for the officers to conduct the illegal warrantless search of his vehicle. Finally, he argues that because the trial court has the discretion to determine the remedy for Ferguson violations, the trial court in this case properly determined that the appropriate remedy was dismissal of the indictment in light of the loss of the camera and its housing, which was the most important piece of evidence in his case.

At the hearing on the motion for reconsideration, the defense argued that the loss or destruction of the camera and its housing prevented Clark from receiving a "fundamentally fair trial" under Ferguson. The defense further argued that because the camera and its housing were lost or destroyed, it was unable to examine whether there were bullets or bullet fragments in the camera or its housing. The prosecutor explained that Redflex owned the "cameras and computers" inside the camera housing, and Progression Electric owned the camera housing and the pole that holds the camera and housing in the air. The prosecutor said that the day after the shooting, the police made photographs of the camera and its housing and "collected the damaged cameras and equipment that was inside that enclosure." Then Redflex arrived at the scene "to put up new working equipment and make [the traffic cameras] work again." Finally, Progression Electric arrived at the scene "because their enclosure had bullet holes in it and, therefore, was not usable anymore[,]" and they installed a new enclosure. He added, "I would have loved it if [the police department] had taken the old [camera enclosure], but they didn't[.]" Instead, "Progression Electric took [the camera

-16-

enclosure] home with them" where it was later "disposed of." The prosecutor then informed the court that although the exterior camera enclosure or housing was never in State custody, the State did take "photographs of it, where the bullet holes are and how they're positioned and the equipment that was inside of it." The defense then likened the camera housing to an onion and argued that the camera housing was essential because the bullets hit the housing first before damaging the equipment inside the housing. The prosecutor responded that the police had collected and retained in the property room "the cameras that were struck by the bullets [and] I believe [the] computer equipment involved [with the cameras]." However, the prosecutor admitted that the equipment that was not damaged by the bullets may have been reused. The prosecutor did not specify the items of undamaged equipment that were reused.

Initially, we note that the information in the record regarding the existence of the traffic camera equipment is extremely unclear. We do know that the metal exterior housing of the camera was not retained by police and was later "disposed of" by Progression Electric, although photographs of this housing were retained. Although the State claims that the cameras inside the housing were retained in the property room and the computer equipment inside the metal housing was possibly retained in the property room, certain unspecified equipment from the traffic camera that was not damaged was not retained because it was recycled for later use. Accordingly, we have no information as to what equipment parts related to the traffic camera were actually retained for use in this case and no information as to the condition of the retained equipment or its amenability for testing. The State does not explain whether bullets or bullet fragments were found in the retained equipment, and no testing results for the retained evidence appear in the record on appeal. Unfortunately, the record shows that the trial court did not inquire as to the existence or condition of this retained equipment or the results of any testing of this equipment. Regarding the scope lens covers, the prosecutor stated only that the lens covers for the rifle scope "obviously did not get confiscated when the gun was confiscated . . . so we don't know where they went[.]"

State v. Ferguson governs claims regarding the State's duty to preserve potentially exculpatory evidence. 2 S.W.3d 912 (Tenn. 1999). Under Ferguson, the primary inquiry is "[w]hether a trial, conducted without the destroyed evidence, would be fundamentally fair[.]" Id. at 914. First, we must consider whether the State had a duty to preserve the evidence in issue. Id. at 917. "Generally speaking, the State has a duty to preserve all evidence subject to discovery and inspection under Tennessee Rule of Criminal Procedure 16, or other applicable law." Id. (footnote omitted). The analysis under Ferguson is only triggered, however, if the alleged exculpatory evidence is determined to be material:

Whatever duty the Constitution imposes on the States to preserve evidence, that duty must be limited to evidence that might be expected to play a significant role in the suspect's defense. To meet this standard of constitutional materiality, evidence must both possess an exculpatory value

-17-

that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.

Id. (quoting California v. Trombetta, 467 U.S. 479, 488–89 (1984)).

Once the court determines that the State had a duty to preserve material evidence and failed in that duty, Ferguson requires the trial court to consider the following factors which bear upon the consequences of the State's breach of its duty:

1.   The degree of negligence involved;

2.   The significance of the destroyed evidence, considered in light of the probative value and reliability of secondary or substitute evidence that remains available; and

3.   The sufficiency of the other evidence used at trial to support the conviction.

Id. (internal footnote omitted). A trial court may dismiss the indictment against the defendant if it determines that "a trial without the missing evidence would not be fundamentally fair." Id. However, a trial court may also enter orders that protect the defendant's right to a fair trial or may issue a jury instruction.

## A.  State's Duty to Preserve Evidence

### 1. Tennesseee Rule of Criminal Procedure 16.

In determining whether the State has a duty to preserve evidence, we must first consider whether the defendant would be entitled to receive the particular pieces of evidence in discovery. Ferguson, 2 S.W.3d at 917. Tennessee Criminal Procedure Rule 16(a)(1)(F) allows the defendant to inspect tangible objects "within the state's possession, custody, or control" that are material to preparing the defense, that the State intends to use in its case-in-chief at trial, or that were obtained from or belonged to the defendant. Here, the photographs of the camera housing are discoverable pursuant to Rule 16(a)(1)(F) because the State intended to present the photographs of the housing as evidence at trial. Although not specifically asserted by the State, we must also assume that the State intended to present the retained equipment inside the camera housing at trial; therefore, it is also discoverable. We also conclude that the scope lens covers are discoverable because they were taken from Clark.

-18-

## 2. Apparent Exculpatory Value

We must next determine whether the evidence in issue has exculpatory value that was apparent before the evidence in question was destroyed. Id. The State argues that the camera and its housing were not apparently exculpatory because (1) the camera and its housing were shot by four bullets, with one bullet traveling in and out of the camera housing; (2) three bullet casings were found in the parking lot from which Clark was leaving when he was first seen by Officer Cox; and (3) a fourth bullet casing was found in the rifle recovered from Clark's vehicle. The State also argues that the camera and its housing were not apparently exculpatory because this evidence would not provide proof of the bullets trajectory since the trajectory could only be obtained if the damaged camera and casing were left in place for an undefined period of time for Clark's inspection. Finally, the State contends that the scope lens covers were not apparently exculpatory because the lens covers matched the scope on the rifle found in Clark's vehicle.

Clark argues that the camera and its housing were apparently exculpatory because they would have enabled him to prove the origin of the bullets, to test whether bullets from his rifle had enough force to penetrate the camera's housing, to test whether the entry and exit holes were consistent with the "caliber of weapon" seized from his vehicle, and to test whether "the angle of deflection in any of the alleged entry or exit holes on the camera cover or housing [were] consistent or inconsistent with regard to the Pittman Automotive location [where Officer Cox saw Clark exit just prior to stopping him]." Clark also argues that the scope lens covers were apparently exculpatory because they could have been subject to "scientific and expert analysis for exculpatory purposes[.]"

In the July 30, 2009 order, the trial court noted that the scope lens covers were "not made a part of the body of evidence which is discoverable in this case." It further noted Clark's argument that the missing camera and its housing precluded him from examining them and prevented him from doing ballistics testing. Without specifically making a ruling regarding the apparent exculpatory nature of the camera, the camera housing, and the scope lens covers, the trial court alluded to the fact that the missing lens covers and the traffic camera and its housing were crucial to Clark's defense before dismissing the indictment.

Upon review, we conclude that the damaged camera and its housing had exculpatory potential because they would have enabled the defense to conduct ballistics and trajectory testing. However, we agree with the State that the scope lens covers did not have apparent exculpatory value since the covers matched the scope on the rifle found in Clark's vehicle.

## 3. Availability of the Comparative Evidence

-19-

Next, we must determine whether the defendant is unable to obtain comparable evidence through other reasonably available means. Id. The State argues that comparable evidence of the camera and its housing was available to Clark since photographs of the camera housing were taken by the State. In response, Clark contends that the photographs are not comparable evidence because they cannot be tested. The State also argues that there is comparable evidence of the scope lens covers because Officers Cox and Keck are available to testify about their discovery of the lens covers in this case, and they would be subject to cross-examination. Clark responds that no comparable evidence is available for the scope lens covers since they were never retained by the State. Interestingly, the trial court makes no mention of the availability of comparable evidence for either the camera and housing or the scope lens covers in its July 30, 2009 order. Upon review, we conclude that the photographs of the camera housing do not constitute available comparable evidence because they cannot be tested. We acknowledge that no comparable evidence exists for the scope lens covers.

Ultimately, after considering these three factors, we conclude that the State had a duty to preserve the camera and its housing but not the missing scope lens covers. While all of this evidence was discoverable, only the camera and its housing had exculpatory potential and were of such a nature that the lack of comparable evidence was significant. In light of our previous determination that the plain viewing of the rifle case provided the basis for the search of Clark's vehicle, we conclude that the absence of comparable evidence for the scope lens covers is not particularly significant. Accordingly, we must now consider the consequences of the State's breach of its duty to preserve the camera and its housing.

## B. Consequences of the State's Breach of its Duty to Preserve Evidence

The State maintains that it had no duty to preserve the camera and its housing. However, it argues that even if it did breach its duty based on some negligence, it contends that there was no violation because (1) the evidence was not significant because of its lack of probative value and because of the reliability of secondary or substitute evidence that remains available, and (2) other evidence was sufficient to support Clark's convictions. In order to determine the consequences of the State's failure to preserve the camera and its housing, we must consider the negligence of the State, the significance of the destroyed or lost evidence, and the sufficiency of the other evidence used at trial. Id.

### 1. Negligence of the State

In determining the State's "degree of negligence," we first note that the trial court does not specifically address the negligence of the State regarding the missing pieces of evidence in its July 30, 2009 order. Id. However, the record does show that the State inadvertently allowed Progression Electric to "dispose of" the camera housing and allowed

-20-

non-damaged portions of the camera equipment to be reused. Nothing in the record reveals that the police department had any established policy regarding the retention of damaged traffic cameras for the purpose of criminal prosecution. See State v. Lonnie T. Lawrence, No. E2007-00114-CCA-R9-CD, 2008 WL 704355, at *14 (Tenn. Crim. App., at Knoxville, Mar. 17, 2008) (distinguishing between simple negligence and gross negligence under Ferguson). Clearly, the State did not intend to destroy the camera or its housing to the detriment of Clark. Although the police were negligent in allowing Progression Electric and possibly Redflex to take portions of the camera equipment, we must conclude that this was simple negligence rather than gross negligence.

## 2. Significance of the Destroyed Evidence

We must next determine "[t]he significance of destroyed evidence considered in light of the probative value and reliability of secondary or substitute evidence that remains available." Ferguson, 2 S.W.3d at 917. The State argues that Clark has failed to show a Ferguson violation based on this factor but does not specifically explain how the lost or destroyed evidence lacks probative value or how the reliability of the secondary or substitute evidence makes the missing evidence insignificant. As mentioned above, the State generally asserts that the camera and housing were not apparently exculpatory and that the photographs of the camera housing constitutes available comparative evidence. Clark argues that the damaged camera and its housing have probative value because they are needed for ballistics testing and that the photographs of the camera housing are not a substitute for the missing evidence because they cannot be tested.

As mentioned above, the photographs of the camera housing are not substitute evidence because the significance of the evidence stems from its ability to be tested. See State v. Lonnie T. Lawrence, No. E2007-00114-CCA-R9-CD, 2008 WL 704355, at *15 (Tenn. Crim. App., at Knoxville, Mar. 17, 2008) (holding that the trial court did not err in suppressing certain photographs of this evidence since the balance of the factors in Ferguson tipped in favor of the defendant, especially given the significance of testing the destroyed physical evidence for fingerprints). We do not know what Clark's testing of the damaged camera and its housing would have revealed; however, we conclude that the ability to test this evidence was significant to Clark's defense.

## 3. Sufficiency of Other Evidence to Convict

Finally, we must consider "[t]he sufficiency of the other evidence used at trial to support the conviction." Ferguson, 2 S.W.3d at 917. Here, Clark's indictment was dismissed prior to trial. However, we do have the benefit of the police report, the testimony of the officers at the preliminary hearing, and the video recording of Clark's stop, arrest, and search, all of which constitute strong evidence against Clark. Officers Cox and Keck

testified that they heard four shots fired from behind the automotive repair shop. As they approached the shop, they saw Clark drive out from behind the shop at a fast speed. At the time of the stop, Clark made incriminating statements. Officer Cox discovered the scope lens covers in his pocket, and Officer Keck observed the rifle case in the backseat of Clark's vehicle. In addition to recovering the rifle, the officers also recovered a box of rifle rounds with four bullets missing. Three spent shell casings were found in the parking lot behind the repair shop, and one spent shell casing was found in the rifle.

Upon review, we conclude that these factors weigh in favor of Clark's receiving some remedy for the Ferguson violation associated with the damaged camera and its housing. However, we conclude that the trial court erred in determining that the proper remedy for this violation was to dismiss Clark's indictment. Accordingly, we reverse the trial court's judgment dismissing the indictment and suppressing the evidence found in Clark's vehicle. Instead, we conclude that the appropriate remedy is to suppress the photographic evidence of the camera housing since this evidence cannot be tested.

## CONCLUSION

Upon review, we conclude that the trial court's order dismissing the indictment and suppressing the evidence found in Clark's vehicle is reversed. We reinstate Clark's indictment, suppress the photographic evidence of the camera housing, and remand the case for trial.

_____
CAMILLE R. McMULLEN, JUDGE

-22-