# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### March 29, 2011 Session

## STATE OF TENNESSEE v. JAMES DAVID MOATS

### Direct Appeal from the Criminal Court for McMinn County
#### No. 09048     Carroll L. Ross, Judge

---

### No. E2010-02013-CCA-R3-CD - Filed November 8, 2011

---

The defendant, James David Moats, stands convicted of driving under the influence ("DUI"), fourth or greater offense, a Class E felony. The trial court sentenced him as a Range I, standard offender to two years in the Tennessee Department of Correction. On appeal, the defendant argues that the trial court erred by denying his motion to suppress and motion for judgment of acquittal. Following our review, we conclude that under the facts of this case the police officer seized the defendant when she pulled up behind the defendant's parked vehicle and activated her blue emergency lights. We further conclude that the officer did not have a reasonable suspicion of criminal activity to justify the seizure. As such, the trial court erred by denying the defendant's motion to suppress evidence, and we reverse the judgment of the trial court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Reversed

JERRY L. SMITH, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., J., joined, and J.C. MCLIN, J., mortuus.[1]

Matthew C. Rogers (at trial and on appeal), and Randy Rogers (at trial), Athens Tennessee, for the appellant, James David Moats.

Robert E. Cooper, Jr., Attorney General and Reporter; Cameron L. Hyder, Assistant Attorney General; Robert Steven Bebb, District Attorney General; and James H. Stutts, Assistant District Attorney General, for the appellee, State of Tennessee.

---

[1]This case was originally assigned to our colleague and friend, Judge J.C. McLin. After Judge McLin's untimely death on September 3, 2011, the case was re-assigned. Prior to his death, Judge McLin and his staff had done extensive work on this case. We have utilized much of that work, incorporated it into this opinion, and take this opportunity to acknowledge the faithful service of Judge McLin as a member of this Court.

# OPINION

## Facts

In February 2009, a McMinn County grand jury indicted the defendant, James David Moats, for DUI, eighth offense. Prior to trial, the defendant moved to suppress the evidence against him, arguing that the police officer did not have reasonable suspicion to seize him.

At the suppression hearing Etowah Police Sergeant, Phyllis Bige, testified that she came into contact with the defendant on December 7, 2008, while on patrol. Between 1:45 a.m. and 2:00 a.m., she saw a vehicle parked in the Bi-Lo grocery store parking lot. She drove by the vehicle and saw the defendant sitting inside on the driver's side. The vehicle's lights were on, and the vehicle was stationary. Sergeant Bige testified that the parking lot had a "No Loitering" sign and that the police had been asked to "extra patrol" the area. She said that she left the parking lot, patrolled another area for five minutes, and returned to the parking lot. Sergeant Bige testified that she approached the vehicle and asked the defendant "if he was okay." She said that the vehicle's keys were in the ignition, but the vehicle was not running. She noticed an open beer can, and the defendant admitted that he had been drinking. She called for her sergeant to come to the scene, and when he arrived, they asked the defendant to exit the vehicle. He had difficulty exiting the vehicle. Subsequently, he performed poorly on three field sobriety tests. Sergeant Bige testified that the defendant submitted to a blood alcohol content ("BAC") test, which revealed that his BAC was 0.19%.

On cross-examination, Sergeant Bige testified that the defendant was the only person in the parking lot. She said that the grocery store had requested extra patrols because of a rise in drug transactions. Sergeant Bige testified that she did not see the defendant doing anything illegal nor did he appear to need help or medical attention. She testified that she "drove up behind [the vehicle], initiated [her] blue lights and walked up to him." She reaffirmed that she did not see anything illegal, saying that it was "only strange that a car would be sitting in a parking lot at almost . . . 2:00 a.m. with the lights on." Sergeant Bige agreed that "[w]hen [she] initiated the blue lights," it was "fair to say that [the defendant] was not free to leave."

The trial court denied the motion to suppress, reasoning that "a police officer may approach a car parked in a public place and ask for driver identification and proof of vehicle registration without any reasonable suspicion of illegal activity." The case proceeded to trial on February 4, 2010.

At trial, Sergeant Bige testified that on December 7, 2008, at approximately 1:50 a.m., she was on patrol and drove through the Bi-Lo grocery store parking lot. She explained that

the store had requested that the police do extra patrols because of problems in the parking lot. Sergeant Bige said that "No Loitering" signs were posted in the parking lot. She observed a pickup truck parked with its lights on in the parking lot, which she said "was kind of out of the ordinary." She patrolled another area for five minutes and returned to the parking lot. The truck was still parked, so she drove up behind it and activated her blue lights. She called in the license plate number before approaching the vehicle. Sergeant Bige testified that the defendant was sitting in the driver's seat, with the keys in the ignition, although the truck was not running. She observed an open beer can in the cupholder. Sergeant Bige testified that the defendant appeared "almost disoriented, very slow to speak, very sleepy acting." He was unable to provide identification upon request although he looked through his wallet for a license. Sergeant Bige testified that the defendant admitted that he had been drinking. When she asked him why he was in the parking lot, he responded that he "was just there." She said that she asked him to exit the truck, and he had "[a] very difficult exit from the vehicle." Another officer, Sergeant Crawford, arrived and began directing the defendant in field sobriety tests. Sergeant Bige testified that she observed the defendant's performance. He attempted three tests but performed "very poorly." Sergeant Bige placed him under arrest and asked him whether he would consent to a BAC test. He consented, and she transported him to a hospital for the test. The parties stipulated that the result was that the defendant had a BAC of 0.19%.

On cross-examination, Sergeant Bige testified that the defendant's vehicle was not running when she first encountered it. She agreed that she never saw the defendant driving the vehicle.

The defendant testified that he met a person with whom he had worked in the 1990s, named Bill Hyatt, earlier in the day. Mr. Hyatt and another man had stopped by the defendant's house. The other man left, while Mr. Hyatt stayed with the defendant, but they planned to meet him later. Eventually, the defendant and Mr. Hyatt went to the Log Cabin Bar. Mr. Hyatt drove the defendant's mother's truck, and the defendant rode with him. The defendant said that he drank alcohol, but he did not recall Mr. Hyatt drinking. He testified that he was celebrating that he was going to be "a new daddy." The other man met them at the bar later. When they decided to leave, Mr. Hyatt drove, and the other man followed behind. The defendant asked Mr. Hyatt to take him to his girlfriend's house. Because that was going to be out of the way for Mr. Hyatt and the other man, Mr. Hyatt refused. The defendant testified that Mr. Hyatt parked the truck at the Bi-Lo grocery store, in the same spot where Sergeant Bige found him later. Mr. Hyatt left with the other man. The defendant testified that it was a cold night, and because of injuries to his back, if he stayed out in the cold, he "could get to the situation that [he] couldn't walk." He explained that the heat only worked on the driver's side of the truck, so he moved to the driver's side to stay warm. The

defendant said that he saw the police officer drive by the first time and shut off the truck. When the officer returned, the truck was not running.

On cross-examination, the defendant testified that he had a cell phone with him that night but was unable to operate it. He said that he did not walk to the gas station nearby because he was concerned about being arrested for public intoxication. The defendant testified that he did not know how the beer got into the truck.

Following the close of proof, the jury convicted the defendant of DUI, fourth offense, a Class E felony. The trial court sentenced him as a Range I, standard offender to two years in the Tennessee Department of Correction.

**Analysis**

The defendant argues that the trial court erred by denying his motion to suppress evidence. He contends that the officer seized him when she activated her blue lights and that she had no reasonable suspicion to seize her. We agree.

"When evaluating the correctness of a trial court's ruling on a pretrial motion to suppress, the court on appeal must uphold the trial court's findings of fact unless the evidence preponderates otherwise.*" State v. Williams*, 185 S.W3d 311, 314 (Tenn. 2006). "Questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." *State v. Lawrence*, 154 S.W.3d 71, 75 (Tenn. 2005) (quoting *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996)). However, appellate review of a trial court's conclusions of law and application of law to facts on a motion to suppress evidence is a de novo review. *See State v. Nicholson*, 188 S.W.3d 649, 656 (Tenn. 2006); *State v. Walton*, 41 S.W.3d 75, 81 (Tenn. 2001).

Both the Fourth Amendment to the United States Constitution and Article I, section 7 of the Tennessee Constitution protect individuals from unreasonable searches and seizures. These constitutional provisions are designed "to prevent arbitrary and oppressive interference with the privacy and personal security of individuals." *State v. Daniel*, 12 S.W.3d 420, 424 (Tenn. 2000) (quoting *INS v. Delgado*, 466 U.S. 210, 216 (1984)). Therefore, "[u]nder both the federal and state constitutions, a warrantless seizure is presumed unreasonable, and evidence discovered as a result thereof is subject to suppression unless the State demonstrates that the seizure was conducted pursuant to one of the narrowly defined exceptions to the warrant requirement." *Nicholson*, 188 S.W.3d at 656; *see also State v. Binette*, 33 S.W.3d 215, 218 (Tenn. 2000). One such exception is a brief investigatory stop by a law enforcement officer if the officer has a reasonable suspicion, based upon specific and

articulable facts, that a person has either committed a criminal offense or is about to commit a criminal offense. *Terry v. Ohio*, 392 U.S. 1, 21 (1968); *Binette*, 33 S.W.3d at 218. This narrow exception has been extended to the investigatory stop of vehicles. *See United States v. Brignoni-Ponce*, 422 U.S. 873, 881 (1975); *State v. Watkins*, 827 S.W.2d 293, 294 (Tenn. 1992). In evaluating whether a police officer has a reasonable suspicion, supported by specific and articulable facts, a court must consider the totality of the circumstances. *Binette*, 33 S.W.3d at 218. Those circumstances may include the personal observations of the police officer, information obtained from other officers and agencies, information obtained from citizens, and the pattern of operation of certain offenders. *State v. Watkins*, 827 S.W.2d 293, 294 (Tenn. 1992). Additionally, the court must consider any rational inferences and deductions that a trained officer may draw from those circumstances. *Id.* Reasonable suspicion is something more than an "inchoate and unparticularized suspicion or hunch." *Terry*, 392 U.S. at 27.

This case is closely analogous to *Williams*, 185 S.W.3d at 313-314. In that case, a police officer testified that he saw the defendant's car parked on a road, stopped behind the car, and initiated his blue emergency lights. *Id*. While the defense presented a different version of events, the trial court and the supreme court found that the same analysis applied. *Id.* at 314. The supreme court determined that the officer seized the defendant the moment that he activated his emergency lights because a reasonable citizen would not feel free to leave after the officer's show of authority in activating the lights. *Id.* at 317. The court held that

> the defendant's encounter with the officer was not voluntary, but rather occurred under a show of authority—the activation of the blue emergency lights—from which a reasonable person would not have felt free to leave. "Few, if any, reasonable citizens, while parked, would simply drive away and assume that the police, in turning on the emergency flashers, would be communicating something other than for them to remain." *Lawson v. State*, 120 Md. App. 610, 707 A.2d 947, 951 (Md. Ct. Spec. App. 1998).

*Id.* The supreme court reasoned that there were situations in which officers could activate their emergency lights for purposes of their safety or the safety of others; however, the officer in that case was not performing a community caretaking function because there was "nothing in this case to indicate that the officer was concerned that the defendant was in need of assistance." *Id.* at 318. The *Williams* court went on to rule that the officer did not have a reasonable suspicion of illegal activity and upheld the trial court's granting of the defendant's motion to suppress. *Id.* at 320.

Under the authority of *Williams*, it is clear that Sergeant Bige seized the defendant the moment she activated her emergency lights because the use of the lights was a show of

authority and a reasonable citizen would not have felt free to leave. *See id.* at 317. She was not performing a community caretaking function because, as she testified, there was no indication that the defendant needed assistance nor was there any other evidence that she needed to activate the lights for safety reasons. Additionally, Sergeant Bige had no reasonable suspicion of illegal activity. She testified that she thought it was strange that a truck was parked in the grocery store parking lot near 2:00 a.m. with its lights on. Essentially, she had an "inchoate and unparticularized suspicion or hunch," which does not rise to the level of reasonable suspicion. *Terry*, 392 U.S. at 27. Without reasonable suspicion, her seizure of the defendant violated the constitutional prohibition against unreasonable seizures. Therefore, we conclude that the evidence does not support the trial court's findings and reverse the trial court's determination that the officer did not seize the defendant without reasonable suspicion when she activated her emergency lights.

**Conclusion**

Based on the foregoing reasons, we reverse the trial court's ruling on the defendant's motion to suppress, vacated the conviction, and dismiss the charge of driving under the influence.

_____
JERRY L. SMITH, JUDGE